THE VILLAGE OF CAMP POINT, Plaintiff-Appellant, v. CONTINENTAL CASUALTY COMPANY, Defendant-Appellee (Edward B. Tucker, Defendant).

Fourth District   No. 4—90—0650

Opinion filed September 12, 1991.—Rehearing denied October 17, 1991.

Rammelkamp, Bradney, Dahman, Kuster, Keaton & Fritsche, P.C., of Jacksonville (Larry D. Kuster, of counsel), for appellant.

John L. McMullin and T. Michael Ward, both of Brown & James, P.C., of St. Louis, Missouri, for appellee.

JUSTICE SPITZ delivered the opinion of the court:

This is an appeal by plaintiff, Village of Camp Point (Village), Illinois, from a declaratory judgment entered following a bench trial conducted in the circuit court of Adams County. The action named former Village attorney Edward B. Tucker and his professional liability carrier, Continental Casualty Company, as defendants, and sought to have the trial court declare one or more occurrences were covered by a series of professional liability policies issued to Tucker by Continental Casualty for the years 1978 through 1982. The trial court, after a bench trial, found there was coverage for one occurrence under a policy issued for 1978. On appeal, plaintiff argues coverage should have been found under the remaining policies and for multiple occurrences.

The starting point for a review of the facts of this case is a description of the relevant portions of the policies involved. Continental Casualty issued a renewal certificate to Tucker & Kanoski, 129 S. Congress Street, Rushville, Illinois, for the policy period July 2, 1978, to July 2, 1979. The policy number was designated as 1267094 and three attorneys were named as insureds, Michael J. Hollahan, Ronald J. Kanoski, and Edward B. Tucker. The liability limits for professional business liability were $100,000 per occurrence and $300,000 aggregate, with a $1,000 deductible. Under this policy the State and Federal securities law violation exclusion was waived under primary coverage. There was no excess coverage. The deductible applied per

occurrence. Under coverage A (professional liability), the company agreed:

> "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages arising from the performance of professional services for others in the insured's capacity as a lawyer because of an error, negligent omission or negligent act of the insured or of any other person or organization for whose error, negligent omission or negligent act the insured is legally responsible."

Coverage A of the policy applied to "errors, negligent omissions and negligent acts taking place during the policy period." With regard to professional services, an "occurrence" is defined in the policy as "an error, negligent omission or negligent act or a series of related errors, negligent omissions or negligent acts, regardless of the number of claims or claimants." "The limit of the Company's liability to pay damages and to pay claims expenses arising therefrom as the result of each occurrence shall not exceed the amount stated in the declaration of the policy as 'each occurrence.' " Of course, the company's limit of liability to pay damages and claims expenses for all occurrences does not exceed the amount in the declaration designated as "aggregate," but if the policy is issued for a person in excess of one year, the aggregate limit of liability applies separately to each annual period.

For the policy period January 1, 1979, to January 1, 1980, Continental Casualty issued comprehensive lawyers' liability policy No. 4381979 to Edward B. Tucker & Associates, 116 S. Capitol, Mt. Sterling, Illinois, covering attorneys Hollahan and Tucker. The limits of liability were $100,000 per occurrence and $300,000 aggregate, with a $1,000 deductible. The relevant language of the policy is essentially the same as the previous policy.

Policy No. 4381979 was renewed for the policy period January 1, 1980, to January 1, 1981. Added to the coverage was a $1 million per occurrence professional business umbrella supplement. The record does not contain the entire policy and, therefore, it must be assumed the pertinent policy language did not change.

However, the policy language did change when policy No. 4381979 was renewed for the policy period January 1, 1981, to January 1, 1982. The policy declaration sheet indicated limits of professional liability as $100,000 for each "claim" and an aggregate of $300,000 (coverage A). In addition, there was added business liability coverage of $100,000 for each "occurrence" (coverage B). No umbrella coverage was indicated thereon. In the policy, coverage B is described as office

premises and nonowned automobile liability coverage and obligated the company to pay damages for bodily injury and property damage arising out of the ownership, maintenance or use of the lawyer's office or a nonowned automobile. Coverage B does not apply to this case, but the word "occurrence" is retained for coverage B while it is changed to "claim" for coverage A. In any event, the relevant language of coverage A obligated the company to pay damages "arising from the performance of professional services for others during the policy period in the insured's capacity as a lawyer, real estate title insurance agent or notary public because of an act or omission of the insured or of any other person or firm for whose act or omission the insured is legally responsible." The policy's definition of "occurrence" is restricted in its application to coverage B. "Claim" is defined as "a demand for money or services or the filing of a suit or institution of arbitration proceedings naming the insured and alleging an insured act, omission or activity." The deductible applied to each "claim." The policy further provided:

"Regardless of the number of insureds, **claims** or claimants:

1. The inclusion herein of more than one insured or the making of **claims** or the bringing of suits by more than one person or organization shall not operate to increase the Company's limit of liability. One or more **claims** arising out of a single act or omission or a series of related acts or omissions shall be treated as a single **claim**."

On January 9, 1978, plaintiff entered into an agreement with Tucker and his law firm. Under the agreement, Tucker was to provide legal representation regarding a special project involving the construction of a golf course and swimming facility. The legal services anticipated to be provided under the agreement were described as, but not limited to, the following:

"1. Furnishing advice and assistance to the governing body being the Village in connection with:

a. Preliminary Project planning; b. The preparation of ordinances, levies and tax and bond work; c. The preparation and enactment of such resolutions as may be necessary in connection with the authorization of financing, construction and operation of the said project; d. The preparation of such Affidavits, publication notices, or other instruments necessary for the conduct of the Project; e. The preparation and completion of such bonds or other obligations as may be necessary to finance the project from time to time; f. The completion, execution of documents for obtaining loans required;

g. The preparation of construction contracts; h. Preparation and adoption of rules and regulations, rates and schedules.

2. The preparation when necessary and review of deeds[,] easements, rendering title opinions with reference thereto; and all other matters required to be accomplished for and on behalf of the Village [in] relation to the project.

3. Obtaining necessary permits and Certificates from County, and other municipal bodies, State regulatory agents, and all public or private sources.

4. Cooperate with the engineers employed by the Village in connection with all engineering contracts for the project.

5. When applicable, secure the assistance of and cooperate with recognized bond counsel in the preparation of documents necessary for the financing of the project as required by the Village.''

The agreement also established Tucker's compensation as follows:

"1. In the event the project is conducted under the guidance of a recognized securities firm the fee for the attorneys services shall be 1% of project costs.

2. In the event the project is not conducted under the guidance of a recognized securities firm the fee for the attorneys services shall be 1.5% of project costs.

3. In the event the project is not completed the attorney shall be paid an hourly rate commensurate to the rate now charged the Village for time spent.

Compensation paid the attorney shall be exclusive of any charges by Bond Counsel as required for the project.''

On September 11, 1978, plaintiff, through its Village Board, adopted ordinance No. 3—1978—1979 (ordinance No. 3) as drafted by Tucker, which authorized the issuance of $550,000 in recreation revenue bonds for the purpose of paying the cost of the project. (Village of Camp Point, Ill., Ordinance 3—1978—1979 (Sept. 11, 1978).) The ordinance contained language pledging revenue-sharing and sales-tax funds as security for the payment of the bonds if the operating revenue from the project was insufficient to service the debt.

On September 12, 1978, Tucker sent a copy of the ordinance No. 3 to attorney Charles P. Carlson, a recognized municipal bonds counsel. They met on September 28, 1978, to discuss ordinance No. 3, and at that meeting, Carlson informed Tucker he could not serve as bond counsel or render a bond opinion on the ordinance. Carlson's main concerns were (1) the pledge of revenue-sharing and sales-tax funds

could make the ordinance invalid, and (2) no feasibility study had been prepared.

After the discussion over Carlson's concerns, the meeting was concluded. Carlson never told Tucker he would serve as bond counsel for the project. Carlson and Tucker never discussed passing a separate resolution pledging the payment of revenue-sharing and sales-tax funds to pay the debt service on the bonds.

On September 30, 1978, plaintiff adopted ordinance No. 4—1978—1979 (ordinance No. 4). (Village of Camp Point, Ill., Ordinance 4—1978—1979 (Sept. 30, 1978).) Ordinance No. 3 was repealed by ordinance No. 4. Ordinance No. 4 contained the same basic provisions as ordinance No. 3, except there was no reference to the pledging of revenue-sharing and sales-tax funds. On September 30, 1978, however, plaintiff's Village Board also passed a separate resolution pledging revenue-sharing and sales-tax funds to ensure payment of the bond obligations. Tucker knew the adoption of the September 30, 1978, resolution was risky and that plaintiff Village might not be able to support this procedure, and the Village Board was so advised. Pursuant to ordinance No. 4, $290,000 worth of the $550,000 in 6% bonds authorized to be issued were sold.

The Village's expert witness, bond counsel Martha Haines, testified that upon the sale of each bond plaintiff incurred the obligation to repay. Haines testified ordinance No. 4 was one of three separate and distinct bond transactions. While Haines believes ordinance No. 4 was properly drafted and is a valid ordinance, she is of the opinion that Tucker failed to meet his professional standard of care in advising plaintiff to adopt the resolution of September 30, 1978, which involved pledging revenue-sharing and sales-tax revenues to secure the payment of the recreation revenue bonds. There is no statutory authority for such a pledge. With Tucker's knowledge about the risky nature of such a pledge, according to Haines, it violated his duty of care to draft the resolution even if instructed to do so. Furthermore, throughout these various transactions, a bond counsel's opinion was not obtained from recognized bond counsel, and no offering circulars were prepared to inform purchasers about the bonds. No proper feasibility study was performed to determine whether the project would succeed.

Haines testified the customary procedure for issuing revenue bonds is to determine the scope of the project and estimate its cost. The next step is to study the feasibility of the project to reveal whether the revenue stream would support the debt and the cost of operation. Bond counsel would ordinarily prepare a bond ordinance. A

purchaser for the whole bond issue would ordinarily be located through a publication requesting bids from underwriters and the public at large. Simultaneously with the adoption of the bond ordinance, the sale of bonds to a particular purchaser would be authorized. There is a bond closing and the bonds are sold. The proceeds are deposited into a project fund and the expenditure of funds is restricted by ordinance to the purpose for which the bonds were issued. This is part of the contract with the bondholders.

The procedures for a valid revenue bond transaction are specified by statute. (Ill. Rev. Stat. 1989, ch. 24, par. 11—94—1.) Haines testified a municipal corporation is authorized to take only those actions expressly provided for by statute. Without an express authorization, a municipality cannot act. For bond counsel, according to Haines, if it is a gray area of the law, an unqualified bond opinion cannot be given.

The distinction between a general obligation bond and a revenue bond is the source of the obligation to repay, Haines testified. General obligation bonds are generally payable from the general corporate resources of the issuing entity. They are usually backed by a pledge of real-estate tax. Revenue bonds, on the other hand, are repaid solely from the revenues of the project being financed. There is a statutory basis for this distinction.

Tucker did not consider himself to have expertise in the area of municipal bonds. On October 25, 1978, Tucker sent a letter to Farmers State Bank of Camp Point and other prospective bond purchasers, which letters were not intended to be relied on for final determination of participation. In the letter, Tucker stated he was enclosing a copy of the bond and a copy of the resolution authorizing the payment of the bonds from revenue-sharing and sales-tax proceeds. He stated plaintiff would provide an offering circular explaining fully the terms and obligations of the bonds and an opinion of bond counsel from Carlson's law firm. Tucker further stated the bonds were considered to be municipal bonds for tax purposes and the resulting income was exempt from taxation. The offering circular and an opinion from bond counsel were never provided. Tucker did not feel he had a right or a duty to tell the Village Board not to adopt the September 30, 1978, resolution pledging sales-tax and revenue-sharing money. He explained the risks and the Village Board made the decision.

Village clerk Charlene Gordon testified that when ordinance No. 4 was adopted there was an understanding that one bond issue was all that would be necessary to complete the project. Gordon also testified

the Village Board followed Tucker's legal advice from 1978 through 1981, and she was not aware of any time that the Village Board refused to comply with Tucker's legal advice. Gerald Bartell, then president of the Farmers State Bank of Camp Point, testified the pledge of revenue-sharing and sales-tax revenues was important to make the bonds salable.

On February 6, 1979, plaintiff established a recreation park bond and interest retirement account, with an initial deposit of $10,000, and $1,500 to be deposited monthly from sales-tax revenue until the Village Board decreed such deposits were no longer necessary for retirement of the bonds. Village of Camp Point, Ill., Resolution (Feb. 6, 1979).

Bartell testified the Farmers State Bank of Camp Point placed a lot of reliance on the February 6, 1979, resolution because the money was going to be set aside for the retirement of the bonds. A copy of this resolution was part of the receipt Farmers State Bank received when it purchased its bonds. Haines opined the February 6, 1979, resolution was invalid. There was no statutory authority for it. The drafting and advice regarding that pledge did not meet the standard of care for an attorney in Illinois.

On December 10, 1979, the Village Board adopted ordinance No. 6—1979—1980 (ordinance No. 6). (Village of Camp Point, Ill., Ordinance 6—1979—1980 (Dec. 10, 1979).) Ordinance No. 6 sought to amend ordinance No. 4 by recalling $260,000 of 6% bonds, and providing instead for the issuance of $260,000 of 8% bonds to mature in 10 years for the purpose of paying the cost of the project. On December 10, 1979, plaintiff Village also adopted a resolution stating that, in order to expedite the sale of the bonds, revenue-sharing and sales-tax funds sufficient to ensure the payment of the bond obligations were being pledged. Village of Camp Point, Ill., Resolution (Dec. 10, 1979).

Tucker prepared ordinance No. 6 because a portion of the 6% bonds were unsold. He did not recall obtaining any advice from Carlson regarding the issuance of the bonds, or regarding the preparation of the ordinance. No consents were obtained from the bondholders who had purchased bonds at 6% under ordinance No. 4 to allow for the reissuance of the remaining unsold bonds. Tucker did not advise the Village Board that by adopting ordinance No. 6 it would violate the parity provisions of ordinance No. 4. Pursuant to the passage of ordinance No. 6, Tucker did not recall advising plaintiff to prepare any additional financial projections or a rate study. No offering circular was prepared, nor was an opinion from bond counsel obtained.

Haines testified ordinance No. 6 is an invalid exercise of municipal authority. The terms of ordinance No. 6 breached the contract with the previous bondholders. The subsequent bonds issued under ordinance No. 6 were not on a parity with the bonds issued and sold under ordinance No. 4, as was required by the earlier ordinance. Nor were the ordinance No. 6 bonds subordinated to the previous bonds. No consents from previous bondholders were obtained. Furthermore, ordinance No. 6 does not meet statutory requirements. The statute requires revenues to be pledged to pay operation and maintenance, then to retire debt and to establish an adequate depreciation fund. Ordinance No. 6 did not establish an operation and maintenance account or a depreciation account. It also reduced the reserve account established by prior ordinance from $30,000 to $20,000. Ordinance No. 6 was not properly published. Finally, ordinance No. 6 materially changed the interest rate and the maturity schedule for the bonds, thereby substantially changing the debt load on the facility. According to Haines, ordinance No. 6 appeared to be an attempt at a refunding of authorized but unissued bonds. To properly refund bonds, all bonds must be refunded and new bonds issued or, in the alternative, consents must be obtained from holders of the original bonds. A refunding is a separate and distinct bond transaction. (See Ill. Rev. Stat. 1989, ch. 24, par. 11—94—1.1.) The resolution of December 10, 1979, pledging revenue-sharing and sales-tax monies is invalid for the same reasons as the earlier September 1978 resolution. This resolution and ordinance No. 6 did not, in Haines' opinion, meet the standard of care for an attorney in Illinois.

On April 14, 1980, plaintiff adopted a resolution effectively raising the rate of interest on the $260,000 of recreation revenue bonds refinanced through ordinance No. 6 from 8% to 9% per annum by discounting the face value of the bonds. (Village of Camp Point, Ill., Resolution (Apr. 14, 1980).) Tucker does not recall drafting this resolution or receiving advice from Carlson about it.

Haines testified the April 14, 1980, resolution was invalid because an ordinance cannot be amended by a resolution. This resolution purports to amend ordinance No. 6. In order to raise the interest rate on bonds or provide for 9% bonds, it would require amending the earlier ordinance, cancelling unissued bonds, or by refunding those that had already been issued. Here, no separate bond transaction was performed. However, bonds were sold pursuant to this resolution by plaintiff on a discounted basis.

On October 12, 1981, the Village adopted resolution No. 6—81—82, authorizing the issuance of an additional $50,000 in recreational

revenue bonds. (Village of Camp Point, Ill., Resolution 6—18—82 (Oct. 12, 1981).) The resolution stated: $550,000 in recreational revenue bonds had been issued by plaintiff under the provisions of ordinance No. 6; the plaintiff deemed additional bonds should be issued in the amount of $50,000 to complete construction; plaintiff had been granted the right to issue additional bonds under the provisions of section 12 of ordinance No. 6; and the bonds were to be bound by the same terms and conditions as set forth in ordinance No. 6.

Although Tucker had resigned as village attorney on August 10, 1981, he agreed to work with plaintiff to complete the project. Village clerk Charlene Gordon typed resolution No. 6—81—82 pursuant to Tucker's dictation over the telephone, although Tucker testified he did not believe he prepared that resolution because of the way it was typed. Tucker did not remember any conversation with bond counsel regarding the preparation of the October 1981 resolution.

Haines testified that resolution No. 6—81—82 is invalid. Bonds must be issued by ordinance, not by resolution. The statutes require an ordinance. Also, the statutes require certain specific steps in establishing the revenue fund and the repayment of the bonds. This resolution is silent as to all those requirements. In drafting the resolution and advising plaintiff regarding this resolution, Tucker did not meet the standard of care.

Haines considered this a separate bond transaction. To issue a separate series of bonds requires a separate and distinct bond transaction. As best she could determine from the resolution, the bonds were intended to be completion bonds, but did not meet the requirements of ordinance No. 6, in that there is no statement from an engineer regarding the necessity of the funds and the use of prior proceeds.

The Village engineer, William H. Klingner, testified he recalled a report was made indicating the last $50,000 in bonds were needed to complete phase two of the project. The need for these funds was unforeseen at the beginning of the project.

The plaintiff subsequently sold $50,000 in bonds, as shown by the testimony of Thomas J. Arnold, CPA, auditor for plaintiff, concerning payment of interest thereon. The facility did not generate sufficient revenues after opening to meet operation expenses and debt obligations. Transfers from other corporate funds, including revenue sharing and sales tax, were made to meet these obligations. This was done pursuant to the various pledges of revenue-sharing and sales-tax money to secure the bonds as adopted by the plaintiff by resolution.

Each time a bond was sold or the general corporate funds were actually transferred to the revenue-bond restricted accounts, accord-

ing to Haines, the Village sustained injury or damage. When funds are transferred to the restricted-revenue accounts, the funds cannot be used for any other purpose pursuant to the contract with the bondholders and the statute. Consequently, plaintiff lost control of the use of those funds for any other purpose.

Plaintiff defaulted to bondholders on December 31, 1986. In June or July 1987, a bondholders' agreement was concluded with all outstanding bondholders settling their claims and reissuing bonds to them. Plaintiff sustained damages in the form of fees and costs in concluding the settlement. Mayor Douglas Aeilts testified plaintiff is not a home-rule unit of government and, to his knowledge, has never been one.

The parties stipulated to the admission into evidence of the discovery deposition of Patrice Wilson, claims supervisor for CNA Insurance. According to Wilson, Continental Casualty is a member of the CNA group. The company settled losses on defaulted bonds with the Boatmen's Bank of Quincy for $10,000 and with the Farmers State Bank of Camp Point for $12,500. These settlements were reached on the theory that only the 1978-79 policy applied to the losses, in that the negligent acts which triggered coverage occurred in 1978.

After considering the evidence and arguments of counsel, the trial court determined that coverage A of policy No. 1267094 only was applicable to the single occurrence in question. The trial court's reasoning was as follows:

"2) That the alleged damages of the Plaintiff in the underlying law action are clearly and indisputably claims for economic loss.

3) That under Illinois law, recovery of economic losses in a legal malpractice proceeding based on claims of negligence may be based only on a contractual theory and may not be based upon a tort theory. (*Collins v. Reynard*, 553 N.E.2d 69 (Ill. App. 4th Dist. 1990.) One exception to this rule which would appear applicable to Count II of the underlying law case is when one intentionally makes false representations. *Moorman Manufacturing v. National Tank Co.* (1982), 91 Ill. 2d 69.

4) That the definition of 'occurrence' contained within the policy applicable to the time period when the employment contract was entered into between Defendant Attorney Tucker and the Plaintiff herein, attached to the original complaint as Exhibit A and received into evidence herein, defines that term to mean:

'With respect to professional services an error, negligent omission or negligent act or a series of related errors, negligent omissions or negligent acts regardless of the number of claims or claimants.'

5) That clearly the work performed by Defendant Tucker, which is the subject of the underlying litigation herein, was all the result of the written employment contract referred to herein and attached to the complaint, and while separate acts were performed by Defendant Tucker over a several year period, the acts or omissions were all 'related' within the meaning and intent of the subject insurance policy. The causative factor in the alleged damage to plaintiff was defendant Tucker's misinterpretation of the permissible use of the sales tax and revenue[-]sharing funds.

6) That a logical analysis of the facts of this cause results in the conclusion that there was one unified transaction conducted pursuant to one contract with performance to be resulting over an extended period of time. Accordingly under Illinois law there was but one occurrence.

7) That in the Court's analysis of this case, it is of great significance that the underlying law case involves only one plaintiff and one defendant with claimed economic loss resulting from legal malpractice in carrying out a written contract of employment.''

In analyzing this case, it may be helpful to consider the following chart:

| Policies | Relevant Activities of Parties |
|---|---|
| | January 9, 1978—agreement between plaintiff and Tucker |
| July 2, 1978, to July 2, 1979: No. 1267094 | |
| | September 11, 1978—ordinance No. 3 (invalid but later repealed by ordinance No. 4) |
| | September 30, 1978—ordinance No. 4 (acceptable according to Haines) |
| | —resolution pledging revenue-sharing and sales-tax funds (not acceptable) |

January 1, 1979, to January 1, 1980:
No. 4381979

February 6, 1979—bond and interest retirement account created

December 10, 1979—ordinance No. 6 (improper refinancing ordinance)

—resolution pledging revenue-sharing and sales-tax funds for bonds under ordinance No. 6

January 1, 1980, to January 1, 1981:
No. 4381979
(First renewal)

April 14, 1980—resolution raising to 9% the interest rate on those bonds refinanced in ordinance No. 6 which remained unsold

January 1, 1981, to January 1, 1982:
No. 4381979
(Second renewal)

October 12, 1981—invalid completion-bond resolution adding $50,000 in bonds under ordinance No. 6

In this case, although extensive testimony was received concerning the nature of the disputed negligent acts, this appeal does not involve the questions of whether legal malpractice was adequately proved or what the proper award of damages recoverable by plaintiff was. Therefore, this analysis will not discuss whether economic losses may be recovered in this case since that is an issue which must be reached in the underlying action. The first question to be decided on appeal is, if Tucker's conduct amounted to actionable legal malpractice, how many "occurrences" were involved, as that term is defined by the policies issued to Tucker.

■■ The key to plaintiff's argument is the testimony of Haines that there were three bond transactions involved. However, the "series-of-related-acts" language in the policy may well cover what would otherwise appear to be separate transactions. Plaintiff argues that to describe Tucker's activities in this case as "one unified

transaction does not seem logical." Both parties agree that the test for determining the number of occurrences relies on an analysis of the causal connection between the malpractice and the injuries. (*Mason v. Home Insurance Co.* (1988), 177 Ill. App. 3d 454, 532 N.E.2d 526; *Michigan Chemical Corp. v. American Home Assurance Co.* (6th Cir. 1984), 728 F.2d 374.) Yet, the parties cannot agree on the number of causes.

■ In the case at bar, plaintiff does not argue that the policy definition of "occurrence" is ambiguous. Plaintiff merely argues that, based on that definition, there were multiple occurrences in this case. In *Arizona Property & Casualty Insurance Guaranty Fund v. Helme* (1987), 153 Ariz. 129, 134-36, 735 P.2d 451, 456-58, 64 A.L.R.4th 651, 660-63, the supreme court of Arizona explained as follows:

> "Ordinarily, if an insurance policy uses 'occurrence' without defining the term, the courts inquire whether ' "there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages." ' See *American Indemnity Co. v. McQuaig*, 435 So.2d 414 (Fla. App. 1983); Annot., 55 A.L.R.2d 1300 (1957 and Supp. 1978); 8A J. APPLEMAN, INSURANCE LAW AND PRACTICE §4891.25, at 16-19 (1981) (if a cause is interrupted or replaced by another cause, the chain of causation is broken and more than one occurrence has taken place). The Imperial policy definition of 'occurrence' employs this causal test (acts or omissions 'resulting in injury') but modifies it by using the phrase 'series of related' acts or omissions. Under the Imperial policy, a 'series of related' causes of an injury merge to constitute only one 'occurrence.'
>
> Therefore, the question we must address is whether the failures of the two doctors should be treated as one 'occurrence' because they constituted a 'series of related incidents, acts or omissions' which resulted in the patient's death. Neither the Imperial policy, the parties, nor the court of appeals have defined the word 'related' and our research does not reveal any generally accepted legal meaning; therefore, we will assume that the policy uses 'related' in its commonly accepted dictionary sense. Webster's dictionary defines the intransitive verb 'relate' as 'show[ing] or establish[ing] a logical or causal connection between.' WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED, at 1916

(1965). A 'related' act or omission, therefore, is one that has a logical *or* causal connection with another act or omission.

We do not believe that the word 'related' as used in the policy can be equated with the phrase 'logical connection.' Logic, like beauty, is in the eye of the beholder and greatly depends upon the subjective mental process of the reviewer. Incidents may be 'logically related' for a wide variety of indefinable reasons. Causal connection depends, to a much greater extent, on objective facts in the record. If we were compelled to equate 'related' with 'logically connected,' we would be compelled to find the policy provision ambiguous, and for that reason to find in favor of the claimant. *Parks v. American Casualty Co.*, 117 Ariz. 339, 341, 572 P.2d 801, 803 (1977). We have attempted to abandon this approach. *See Transamerica Insurance Group v. Meere*, 143 Ariz. 351, 355, 694 P.2d 181, 185 (1984). We prefer, instead, to determine the meaning of a clause which is subject to different interpretations or constructions by examining the purpose of the clause, public policy considerations, and the transaction as a whole. *Id.*

The correlation between 'series of related acts or omissions' and 'causation' is apparent after examining arguments made by claimants in other multiple-act cases and the manner in which some courts have interpreted similar words when not expressly defined in the policy. *See, e.g., Home Indemnity Co. v. City of Mobile*, 749 F.2d 659 (11th Cir. 1984) (200 homeowners argued that 'occurrence' should be defined in terms of the resulting damage to each of their properties—court holds that number of 'occurrences' depends upon the number of causative acts, not the number of injuries resulting); *Travelers Indemnity Co. v. New England Box Co.*, 102 N.H. 380, 157 A.2d 765, 767 (1960) (several parties tried to collect 'per accident' policy limits for damage to each of their properties—words held to refer to multiple causes rather than multiple effects); *Bacon v. Miller*, 113 N.J. Super. 271, 273 A.2d 602 (1971) (plaintiff claimed more than one 'accident' when car involved in collision careened into several pedestrians—court restricted recovery to limit for one accident). These cases compel the conclusion that the number of causative acts is the key to interpreting 'per occurrence' clauses.

We think it clear that Imperial limited 'occurrence' by using the terms 'series of related incidents ...' to protect itself

from the contention that multiple, causally[ ] connected negligent acts constituted more than one occurrence. The Fund reflected this concern in its briefs when it argued that under survivors' interpretation, '[i]t is foreseeable that each and every time any doctor saw or examined a patient, such failure to accurately re-diagnose the condition would constitute a separate occurrence.' Limiting coverage for separate 'occurrences' by construing a series of causally connected acts or omissions to be a single occurrence would address this concern adequately.

The Fund also argues that there was only one 'occurrence' because there was only one injury. The cases, however, show that the number of causative acts, and not the number of injuries produced, determines the number of 'occurrences.' *See, e.g., St. Paul Fire & Marine Insurance Co. v. Hawaiian Insurance & Guaranty Co.*, 2 Haw. App. 595, 596, 637 P.2d 1146, 1147 (1981) (separate claims made out each time doctors negligently administered anesthetic to patient-decedent— all causing a single result, death); *McQuaig, supra* (each of three shotgun blasts fired by homeowner was a separate 'occurrence' although blasts only injured two people); see also *Maurice Pincoffs Co. v. St. Paul Fire & Marine Insurance Co.*, 447 F.2d 204 (5th Cir. 1971) (each of eight sales of contaminated bird seed was a separate 'occurrence' because each separate sale subjected the insured to liability); *St. Paul-Mercury Indemnity Co. v. Rutland*, 225 F.2d 689 (5th Cir. 1955) (one 'occurrence' when 16 freight cars owned by 14 different owners destroyed in a *single* accident); *Home Indemnity Co., supra* (each discrete act or omission or series of acts or omissions, by city which caused flooding is an 'occurrence'); *Colbert County Hospital Board v. Bellefonte Insurance Co.*, 725 F.2d 651 (11th Cir. 1984) (patient could recover for three 'claims' against hospital for three separate surgeries negligently performed by same doctor—each surgery allegedly producing separate injury).

Thus, we conclude that the number of acts producing injury or damage, rather than the number of injuries caused, is the key on which the definition of 'occurrence' turns. Multiple acts causing a single injury will constitute multiple occurrences, while a single act will constitute a single occurrence even though it causes multiple injuries or multiple episodes of injury. It follows that Imperial's use of the word 'related' in

the phrase 'series of related acts' was meant to exclude *causally related* acts from the rule that multiple causative acts constitute multiple occurrences. Therefore, we hold that the proper construction of Imperial's definition is that even though there have been multiple causative acts, there will be a single 'occurrence' if the acts are causally *related to each other* as well as to the final result."

If there is a problem with the analysis by the parties in the case at bar, it is the failure to adequately define the legal terms within the context of the case. In order for this court to determine the cause or causes of the injuries, it is incumbent for the parties to advise this court, with specificity, of the nature of the injuries.

The record does not include a copy of the complaint in the underlying action. Therefore, any conclusion as to the nature of the damages sought and the injury or injuries complained of in the underlying action is derived from the testimony. Apparently, the plaintiff seeks damages not because some of the bonds are invalid, but because the plaintiff paid part of the bond obligations from the general funds including revenue-sharing and sales-tax funds. In fact, it cannot be ascertained from the record that, had the bonds been validly drawn, plaintiff would have incurred any greater liability on the bonds, with the exception that revenue-sharing and sales-tax monies might not have been properly spent.

Furthermore, the existence of the written contract of employment between the parties is not a determinative factor. There is generally a contract of employment between attorney and client. Nevertheless, it is possible that more than one unrelated negligent act or omission could happen during legal representation pursuant to such a contract. Instead, the operative contracts in this case are the insurance policies, and it is important to remember that the polices do not cover the sales of the bonds by plaintiff, but the rendering of legal services to plaintiff by Tucker.

In the absence of allegations or evidence relative to the underlying suit, the only claim of injury demonstrated by the facts of this case is the payment of the bonds out of revenue-sharing and sales-tax funds and the resultant loss of use of that money. However, there exists the possibility of other damages to plaintiff. For example, should ordinance No. 4 bondholders claim the right to additional funds because of a lack of parity with ordinance No. 6 bonds and never having been given the opportunity to refund the ordinance No. 4 bonds, this injury would appear to result from a cause unrelated to pledging sales-tax and revenue-sharing funds. Since

the record does not clearly indicate plaintiff's seeking any other recovery for any injury except the improper application of revenue-sharing and sales-tax funds to revenue bonds, it is that general characterization of the injury which will be relied on by this court. However, within this general characterization of injury are included four specific injuries to plaintiff which are more than just elements of damages for a single injury. These four injuries are (1) pledging revenue-sharing and sales-tax funds for $550,000 in bonds issued at 6%, improperly pledged by resolution in conjunction with ordinance No. 4; (2) pledging by resolution revenue-sharing and sales-tax funds to cover *additional interest* on $260,000 in bonds refinanced under ordinance No. 6, which raised the interest rate from 6% to 8%; (3) increasing the interest on unsold ordinance No. 6 bonds from 8% to 9% by discounting them; and (4) issuing $50,000 in completion bonds, plus interest.

Moreover, it is incorrect to determine that the negligent act was the rendering of legal advice which Tucker mistakenly believed to be correct. Had this been the case, it is arguable that all of the injuries would have resulted from a series of related acts such that but one "occurrence" was proved. (See *Pioneer National Title Insurance Co. v. Andrews* (5th Cir. 1981), 652 F.2d 439; *Aetna Casualty & Surety Co. v. Medical Protective Co.* (N.D. Ill. 1983), 575 F. Supp. 901; *Transamerica Insurance Co. v. Keown* (D. N.J. 1978), 451 F. Supp. 397.) However, without conceding there is any malpractice at all, this court must look to the acts of negligence to which the evidence points. Those acts are the drafting of documents for plaintiff, each of which increased plaintiff's liability, while all the time the attorney was fully aware that the pledging of revenue-sharing and sales-tax funds to retire the debts was not statutorily approved. Every time Tucker rendered legal services knowing his activities contravened the relevant legal principles is a separate cause for an injury. There was no mistaken interpretation which Tucker relied on throughout.

■ As a result, there are four separate occurrences resulting in four separate and distinct injuries. The cause of none of the injuries flows naturally through the preceding event. Nor do they arise from the same underlying cause, as the trial court found. These are not subsequently manifested damages which naturally flow from the initial injury. In the absence of other exclusions—since (1) the policies cover errors, negligent acts or negligent omissions taking place during the policy period, (2) the renewal of a policy is generally conceived to be a new contract (*Thieme v. Union Labor Life Insur-*

*ance Co.* (1956), 12 Ill. App. 2d 110, 138 N.E.2d 857; 22 Ill. L. & Prac. *Insurance* §130 (1956); 43 Am. Jur. 2d *Insurance* §443 (1982)), and (3) the plaintiff was injured as soon as plaintiff paid revenue-sharing and sales-tax funds for each enumerated transaction—the relevant policy in effect at the time of the error, act, or omission which caused the injury provides coverage. Based only on an analysis of what constitutes an "occurrence," we therefore conclude as follows: (1) any damage resulting to plaintiff from pledging revenue-sharing and sales-tax funds to support the $550,000 in 6% bonds issued by ordinance No. 4 is covered by policy No. 1267094; (2) any damages to plaintiff resulting from the pledging of revenue-sharing and sales-tax funds to support the *increase in interest* on $260,000 of bonds refinanced by ordinance No. 6 is covered by policy No. 4381979, effective from January 1, 1979, to January 1, 1980; (3) any damages to plaintiff resulting from the pledging of sales-tax and revenue-sharing funds to support the *change in interest rate* from 8% to 9% by discounting unsold ordinance No. 6 bonds is covered by policy No. 4381979 effective January 1, 1980, to January 1, 1981; and (4) any damages resulting from pledging revenue-sharing and sales-tax funds to support issuing $50,000 in completion bonds, plus interest thereon, is covered by policy No. 4381979, effective January 1, 1981, to January 1, 1982.

Neither the trial court nor this court has determined which injuries occurred during the policy periods of the subject policies. Therefore, regardless of the number of occurrences, there may nevertheless be a need to further analyze when plaintiff was injured in order to ascertain which policy or policies provide the coverage. (See *American Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg* (7th Cir. 1987), 811 F.2d 1077.) Accordingly, the judgment of the circuit court of Adams County is reversed and the cause is remanded for further proceedings.

Reversed and remanded.

LUND, P.J., and GREEN, J., concur.