JOHN MASON *et al.*, Plaintiffs-Appellants, v. THE HOME INSURANCE COMPANY OF ILLINOIS *et al.*, Defendants-Appellees.

Third District No. 3—88—0070

Opinion filed December 21, 1988.

Roger B. Gomien and Paul E. Root, both of Gomien, Root & Rigazio, of Morris, for appellants.

Thomas A. Murphy and Nancy K. Caran, both of Haskell & Perrin, of Chicago, for appellee Home Insurance Company of Illinois.

T. Donald Henson, of Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., of La Salle, for appellee International Insurance Company.

JUSTICE HEIPLE delivered the opinion of the court:

The plaintiffs, patrons of a local restaurant, who consumed tainted food, and certain of their family members, appeal from a trial court order granting the defendants' motions for summary judgment and denying the plaintiffs' cross-motion for summary judgment. They also appeal from the trial court order denying their motion to reconsider and vacate. We reverse.

In October 1983, JMK/Skewer, Inc. (Insured), owned and operated a restaurant known as the Skewer Inn in Peoria, Illinois. On October 14, 15, and 16 of that year, numerous patrons of the Skewer Inn purchased and consumed patty melt sandwiches contaminated with botulinal toxin, and subsequently were stricken with botulism poisoning. The National Center for Disease Control determined that epidemiologic evidence implicated the sauteed onions on the patty melts as the source of the outbreak. The injured patrons and their families filed suits against JMK/Skewer, Inc., and others.

A dispute arose as to the amount of coverage available under the Insured's policies. As a result of the dispute, on April 12, 1985, several of the plaintiffs filed the instant complaint for declaratory judgment against the defendants, two companies which had issued insurance policies to JMK/Skewer, Inc., to determine the amount of insurance coverage available to the Insured in the pending liability actions. Thereafter, all individuals known or thought to have claims against the Insured were made parties to the cause. The defendants answered the complaint for declaratory judgment and filed counterclaims for declaratory judgment. Finally, cross-motions for summary judgment were filed by the plaintiffs and the two insurance companies.

At the time of the injuries, the Insured was covered by a primary business owner's policy issued by The Home Insurance Company of Il-

linois (Home) and by an excess liability insurance policy issued by International Insurance Company (International). In their brief, the plaintiffs state that they do not contest the trial court's determination regarding the policy limits of the Home policy, so those policy provisions will not be set forth.

Section I of the International policy provides:

"The Company agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law arising out of an occurrence or assumed by the insured under contract, for:

(a) Personal Injury Liability,
(b) Property Damage Liability, or
(c) Advertising Liability."

The policy provides that the limit of liability coverage for I(a), I(b), I(c), or all combined with respect to each occurrence is $1 million. Another provision of the International policy establishes a $1 million aggregate limit for each annual period with respect to products hazard coverage.

Section III of the International policy defines the terms relevant to this appeal as follows:

"OCCURRENCE

With respect to Coverage 1(a) and 1(b) 'occurrence' means either an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

PRODUCTS HAZARD

'Products hazard' means (a) the handling or use of or the existence of any condition in or a warranty of goods or products manufactured, sold, handled or distributed by the named insured or by others trading under its name, if the occurrence happens after possession of such goods or products has been relinquished to others by the named insured or by others trading under its name and if such occurrence happens away from premises owned by, rented to or controlled by the named insured ***."

In the court below, the plaintiffs argued that each separate and distinct sale and consumption of botulism-tainted food constituted a separate occurrence under the policy terms, so that each consumer

was entitled to up to $1 million for the injuries sustained. The plaintiffs also maintained that the aggregate limitation of the products hazard provision did not apply because the occurrence did not take place away from the premises or after possession of the product was relinquished. International argued that there was only one occurrence and that coverage, regardless of the number of patrons injured, was limited to $1 million. Further, International asserted that the products hazard limitation applied so that irrespective of the number of occurrences, recovery was limited to the annual aggregate of $1 million.

The trial court determined that all of the plaintiffs' claims constituted one occurrence and that the liability section of the Home policy restricted recovery to $500,000 and the liability section of the International policy restricted recovery to $1 million for all claims. The court also noted that because the International policy provided excess liability coverage, that coverage would not be available until the limits of the underlying Home policy had been exhausted. Additionally, the trial court held that all of the claims asserted fell within the products hazard provisions of the policies and total coverage was for this reason also limited to $500,000 in the Home policy and $1 million in the International policy. The defendants' motions for summary judgment were granted. The court denied the plaintiffs' summary judgment motion and their subsequently filed motion to reconsider and vacate. This appeal followed, but as previously noted, the plaintiffs no longer contest the court's ruling that coverage under the Home policy is limited to $500,000.

■■ ■ On appeal, the plaintiffs continue to assert that each of their claims arose out of a separate occurrence and that the claims do not fall within the products hazard provision of International's policy. Resolution of these issues turns on the correct interpretation of the policy, and in our interpretation, we are bound by the established principles of Illinois contract law. In interpreting an insurance policy, a court's primary concern is to effectuate the intent of the parties as expressed by the contract. The insurance policy should be construed as a whole, giving effect to every part, as far as possible. (*Illinois Central Gulf R.R. v. Continental Casualty Co.* (1985), 132 Ill. App. 3d 310.) If the provisions of an insurance policy are clear and unambiguous, there is no need for construction and they will be applied as written. A contract term may be unambiguous if it has acquired an established legal meaning. (*United States Fire Insurance Co. v. Schnackenberg* (1981), 88 Ill. 2d 1, 5.) A policy provision may be deemed ambiguous, however, if it is subject to more than one reasonable interpretation. (*Marathon Plastics, Inc. v. International Insur-*

*ance Co.* (1987), 161 Ill. App. 3d 452.) Any ambiguity in an insurance policy is to be construed against the insurer, as the one who drafted the instrument. *Schnackenberg*, 88 Ill. 2d at 4.

With the foregoing rules in mind, we first examine whether, under the terms of the policy, the plaintiffs' claims arose out of one occurrence. The policy defines an occurrence as either an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury. The provision further states that all damages arising out of such exposure to substantially the same conditions shall be considered as arising out of one occurrence. The trial court, in ruling that all of the plaintiffs' claims arose out of a single occurrence, stated that it was aligning itself with the heavier weight of judicial authority which determined the number of occurrences by examining the cause of the loss rather than the effect. International maintains that the trial court was correct and asserts that the occurrence giving rise to all of the claims was the method in which the sauteed onions were prepared. The insurance company also argues that the injuries arose out of exposure to substantially the same conditions, and that the policy dictates that the circumstances be considered one occurrence. The plaintiffs contend that each of the claims arose out of a separate, distinct accident, happening, or event and that there was no "continuous or repeated exposure to conditions," so the policy does not require a determination that all claims arose out of a single occurrence. For the reasons set forth below, we agree with the plaintiffs.

■ The parties have not cited, and our research has not disclosed, an Illinois case interpreting the term "occurrence" in a liability policy to determine whether one or multiple occurrences existed. However, courts in numerous other jurisdictions have had occasion to interpret language similar or virtually identical to that contained in the International policy. (See *Michigan Chemical Corp. v. American Home Assurance Co.* (6th Cir. 1984), 728 F.2d 374 (and cases cited therein).) A vast majority of these courts have concluded that the number of occurrences is determined by referring to the cause or causes of the damage, rather than to the number of individual claims or injuries. After reviewing these cases, the *Michigan Chemical Corp.* court stated that where courts over an extended period of time reached virtually the same result in interpreting the term "occurrence," especially when the policy language indicated coverage was to be based on a "per occurrence" rather than a "per claim" basis, the policy terms admit of only one reasonable interpretation. The court then held the definitions of "occurrence" in the policies in that case

(which were virtually identical to the definition in the International policy) were unambiguous. (*Michigan Chemical Corp.*, 728 F.2d at 379.) We agree with the above analysis and find the term "occurrence" and its definition in the policy before us to be unambiguous.

■■ ■ Based on the foregoing, we find that the trial court correctly followed the majority of jurisdictions which have interpreted similar "occurrence" definitions and have concluded that the number of occurrences is determined by referring to the cause or causes of the damage rather than to the number of individual claims or injuries. However, the trial court apparently determined, and International continues to argue, that in the instant case, the cause of the injuries was the improper preparation of the onions. This is incorrect. The "occurrence" to which the policy refers is the occurrence or events for which the insured was liable, and here, the insured incurred liability for serving its patrons contaminated food.

So long as the Skewer Inn retained possession of the tainted food, no liability could result. Serving to a consumer a food item contaminated with the botulism toxin constituted the act from which liability arose. Each instance in which a customer was presented with tainted food over the three-day period created additional exposure to liability and constituted a separate occurrence under the policy. No plaintiff was subjected to either a continuous or repeated exposure to conditions causing injury. These circumstances did not present one uninterrupted and continuing cause, but several distinct acts—individual sales to separate patrons over a three-day period—each of which resulted in exposure to liability. Accordingly, the trial court erred in ruling that the plaintiffs' claims arose out of a single occurrence.

Examination of the *Michigan Chemical Corp.* case is useful because its facts are analogous and the court's analysis is enlightening. Michigan Chemical Corporation (MCC) produced both a livestock feed supplement and a toxin-containing flame retardant. The products were packaged in nearly identical 50-pound bags. On May 2, 1973, MCC accidentally shipped the flame retardant to Farm Bureau Services, which then mixed the product with regular feed and sold the mixture to farmers. The district court did not determine whether other accidental shipments occurred. Over 40,000 animals were destroyed and their owners filed hundreds of claims against MCC and Farm Bureau Services. MCC possessed several liability policies and the definitions of "occurrence" in the controlling policies were substantially the same as the one in the policy before us.

MCC argued that each claim filed against it constituted an occurrence, while several of the insurers maintained that there was only

one occurrence, the May 2, 1973, accidental shipment. The district court found the definitions of "occurrence" to be ambiguous, construed the policies against the defendant-insurers, and agreed with MCC that the number of occurrences equals the number of claims. The court of appeals reversed, finding that Illinois courts would follow the majority of decisions which have held that the number of occurrences is determined by examining the cause or causes of the injury. *Michigan Chemical Corp.*, 728 F.2d at 380.

Importantly, the court of appeals instructed the district court to determine how many misshipments occurred because it emphasized that each shipment would constitute a separate occurrence under the policies. The court noted that the shipment of the flame retardant constituted the act from which liability arose, and that each shipment would be a distinct act which created additional exposure to liability. *Michigan Chemical Corp.*, 728 F.2d at 383.

This case is highly analogous. The Insured could not be subject to liability until it served a portion of the contaminated food, which constituted the act from which liability arose. Service of numerous portions to individual patrons over the three-day period involved here constituted multiple, distinct acts or occurrences. There was not an uninterrupted and continuing cause from which all of the injuries resulted, as is the case when guests' property is damaged in a hotel fire (*Denham v. La Salle-Madison Hotel Co.* (7th Cir. 1948), 168 F.2d 576, *cert. denied* (1948), 335 U.S. 871, 93 L. Ed. 415, 69 S. Ct. 167) or when an open faucet on an upper floor of a building causes water damage to property on lower floors. *Allied Grand Doll Manufacturing Co. v. Globe Indemnity Co.* (1962), 15 A.D. 2d 901, 225 N.Y.S.2d 595.

Thus, while the court below properly looked to the cause of the injuries to determine the number of occurrences, it failed to correctly identify that the injuries were caused by the restaurant's serving portions of contaminated food to individual patrons. Accordingly, we hold that the plaintiffs' claims did not arise out of a single occurrence, but that the insured's service of separate portions of tainted food to individual patrons resulted in multiple occurrences under the policy's definition.

While we have determined that the term "occurrence" is unambiguous in this case, we recognize that ambiguity is, to a great extent, in the eye of the beholder. Had we found the term to be unclear and ambiguous, we would have been obliged to construe the relevant provisions most favorably to the insured. (*Marathon Plastics v. International Insurance Co.* (1987), 161 Ill. App. 3d 452.) This construction

would likewise have resulted in a determination that each time the Insured served a portion of contaminated food, it exposed itself to liability under the policy because each order constituted a separate occurrence.

■ We turn now to an examination of the trial court's ruling that all of the plaintiffs' claims fell within the products hazards provision of the International policy and that coverage was therefore limited to the annual aggregate of $1 million. The plaintiffs contend that the products hazard limitation applies only if the occurrence takes place away from the premises and that requirement was not satisfied here. We agree and find the products hazard limitation is inapplicable in the instant case.

According to the International policy, the products hazard coverage applies to situations in which defective goods or products are manufactured, sold, or distributed by the insured (1) if the occurrence happens after possession of the goods or products has been relinquished to others by the insured *and* (2) if the occurrence happens away from the premises owned or controlled by the insured. The parties agree that for purposes of the products hazard provision, "occurrence" refers to the suffering of bodily injury.

At the trial court level, the plaintiffs maintained that the Insured did not relinquish possession of the food until the patron paid for the product. On appeal, the plaintiffs have abandoned this feeble claim and argue only that the plaintiffs suffered personal injury on the premises at the moment each of them consumed food items contaminated with botulism, so the products hazard provision does not apply. International contends that because medical documents show that the plaintiffs did not exhibit symptoms of botulism poisoning until at least 11 hours after ingesting the tainted food, it would be sheer speculation to conclude the plaintiffs' injuries occurred when they ate the food at the Skewer Inn. International thus argues that the plaintiffs became ill away from the premises and that the trial court correctly determined that the products hazard provision applies and limits International's total liability to $1 million.

International calls our attention to *Hartford Accident & Indemnity Co. v. Aetna Life & Casualty Insurance Co.* (1984), 98 N.J. 18, 483 A.2d 402 as support for its argument. In that case, a child who was administered certain medication showed no signs of injury until approximately two weeks after being exposed to the drug. At issue was whether the child was injured and liability coverage was triggered on the date of exposure to the drug or on the date symptoms of the injury were manifested. The court held that coverage was not

triggered until the child suffered an injury and, from the facts in that case, it would be speculation to conclude that the child suffered some unmanifested damage before the symptoms appeared. The court stated that it was possible that the drug had some initial positive effects and there was no evidence that the drug had a cumulative, progressive adverse impact.

The facts in the above case are easily distinguishable from those in the case at bar. The plaintiffs in this case consumed food contaminated with botulism. It would be unreasonable to argue that the consumption of botulinal toxin had any initial positive effects on the plaintiffs. Rather, logic compels us to find that even though the symptoms of botulism poisoning were not immediately manifested, the plaintiffs sustained their injuries when they consumed the tainted food. Because the plaintiffs consumed the contaminated food on the insured's premises, the second requirement of the products hazard provision was not satisfied, and that provision of the International policy does not apply. We note that our supreme court recently determined, after examining extensive medical evidence regarding the effect of asbestos exposure, that bodily injury occurs when asbestos fibers are inhaled and retained in the lung. (*Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 45.) This case supports our determination that although overt symptoms of physical injury did not appear immediately, the bodily injury occurred when the toxic substance, the tainted food, was ingested. Accordingly, we find that the trial court erroneously determined that the plaintiffs' claims fell under the products hazard coverage and that the $1 million aggregate limit of the International policy provision applied.

In summary, we hold that the plaintiffs' claims arose out of multiple occurrences, rather than a single occurrence as the trial court determined. Additionally, we hold that the court erred in determining that the products hazard provision was applicable in these circumstances. Therefore, we reverse the order of the circuit court of Peoria County.

Reversed.

SCOTT and WOMBACHER, JJ., concur.