Docket No. 101844.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

NICOR, INC., *et al.*, Appellants, v. ASSOCIATED ELECTRIC AND GAS INSURANCE SERVICES LIMITED *et al.* (Certain Underwriters at Lloyd's of London *et al.*, Appellees).

*Opinion filed November 30, 2006.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, and Garman concurred in the judgment and opinion.

Justice Burke took no part in the decision.

## OPINION

Nicor, Inc., and Northern Illinois Gas Company, doing business as Nicor Gas Company (hereinafter referred to collectively as Nicor), are in the business of supplying natural gas to homes and businesses throughout northern Illinois. The litigation before us today concerns the obligation of certain of Nicor's liability insurance carriers to indemnify the company for sums it expended in connection with the remediation of mercury contamination caused by the removal of gas meter regulators from the homes of its residential customers between 1961 and 1978. During the course of the litigation, which spanned a four-year period between 2000 and 2004, some of the defendant

insurance carriers settled. The defendants designated by the parties as "certain underwriters at Lloyd's of London and certain London market insurance companies" (the London Insurers) did not. In late 2004, the circuit court entered judgment in favor of Nicor and against the London Insurers in the amount of $10,281,703.46. The London Insurers appealed. The appellate court reversed and remanded for further proceedings on the sole ground that the circuit court had misapplied the terms of the applicable insurance policies. 362 Ill. App. 3d 745. We granted Nicor's petition for leave to appeal. 177 Ill. 2d R. 315. For the reasons that follow, we now affirm the appellate court's judgment.

## BACKGROUND

Nicor installs meters at the homes of its residential customers to measure the amount of natural gas the customers consume. Each meter contains a regulator which controls the flow of natural gas into the residence. The regulators decrease the high pressure used to transport natural gas through the delivery system to the lower pressures utilized within customers' homes. As a safety feature, the regulators include a relief valve that opens if the pressure of the gas being supplied to a customer's home is excessive.

Until 1961, Nicor utilized gas meters whose regulators included relief valves containing the metallic element mercury. The quantity of mercury in a given unit ranged from 1½ to 4 ounces. The mercury, which remained liquid at room temperature, served as a "cap" on the relief valve. If the gas pressure in the system was too high, it would force the mercury "cap" aside, enabling the gas to pass through a vent and escape safely to the outside of the home.

Beginning in 1961, Nicor initiated a systemwide program to remove regulators containing mercury from inside their customers' homes and to replace them with new regulators utilizing a spring-activated relief mechanism. The new regulators with spring-activated relief valves were part of temperature-compensating meter sets that could be installed on the outside of customers' homes. No mercury was used in any part of these replacement meter sets.

In implementing its replacement program during this period, Nicor did not dispatch crews specifically to exchange meters. New

meters were installed only if an old-style meter was discovered by a Nicor service crew sent to the area for some other reason, such as to perform maintenance or repair work at a customer's home or to upgrade a neighborhood's natural gas service. Whenever a Nicor crew found that a customer's meter set was located in the house, it would remove that meter set and install one of the new temperature-compensating meters outside the residence. As part of this process, the Nicor crew would replace the old regulator containing a mercury relief valve with one of the new regulators equipped with a spring-activated relief valve.

The replacement process was normally safe and unremarkable. In a very small number of cases, however, regulators were tilted or tipped in a way that allowed mercury to spill out and contaminate the customer's home. The problem of contamination surfaced during the summer of 2000, when Nicor learned that a contractor it had hired had spilled mercury in a customer's home while removing one of the old regulators.

The initial contamination report was followed by revelations that additional mercury spills had occurred in the homes of other Nicor customers. Class actions seeking damages for personal injury and property damage were soon instituted against the company on behalf of all those who had been affected by the mercury spills resulting from the replacement of the old-style regulators. The Illinois Attorney General, joined by the State's Attorneys of Cook, Du Page and Will Counties, also brought a separate suit against Nicor in the circuit court of Cook County. The Attorney General's action demanded, *inter alia*, that Nicor be required to investigate the extent of mercury contamination caused by replacement of its natural gas regulators, to clean up the contamination, and to assist all potentially affected individuals in determining whether they had suffered any mercury exposure.

Nicor was able to reach a settlement with the Attorney General's office shortly after it filed its action. The class actions were consolidated and settled as well. Under the terms of the settlement in the Attorney General's action, Nicor was required to identify all homes within its service area that may have been contaminated by mercury from an old-style regulator and to undertake appropriate measures to clean up any contamination that was detected. Nicor

subsequently ascertained that over 300,000 of its customers' homes may have had regulators with relief valves containing mercury. Approximately one third of those homes were determined to have been constructed after the period when the old-style relief valves were no longer being installed in new construction and were therefore not at risk for mercury contamination. The remaining 200,000 homes were physically inspected. Of those, 1,070, or approximately one-half of 1%, were found to contain impermissibly high levels of mercury. For the purposes of this litigation, the parties have stipulated that the mercury found in those 1,070 homes "was more likely than not due to the removal of mercury-containing regulators from inside the homes."

The process of investigating, identifying and remediating the mercury contamination in its customers' homes cost Nicor approximately $90 million. Nicor turned to its insurers to obtain indemnification for those expenses. When the insurers refused to pay Nicor's claims, the company brought this action against them in the circuit court of Cook County. Nicor's suit sought declaratory relief and damages based on breach of contract and anticipatory breach of contract.

All of the defendant insurance carriers that were still solvent agreed to a settlement with Nicor, with the exception of the London Insurers. Nicor had purchased polices from the London Insurers between 1961 and 1978. The policies issued by the London Insurers were excess/umbrella general liability policies under which the insurers were required to indemnify Nicor for all sums Nicor became legally obligated to pay because of property damage caused by or growing out of "an occurrence." Under the policies issued between 1961 and November 1976, an "occurrence" was defined as "one happening or series of happenings arising out of or due to one event taking place during the term of this contract." The policies issued from November 1976 through 1978 defined an "occurrence" as:

> "(1) an accident, or (2) event or continuous or repeated exposure to conditions which result in bodily injury, personal injury, death or physical damage to or destruction of tangible property, including the loss of use. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

Under all of the London Insurers' policies, the insurers' obligation to provide indemnification was subject to a self-insured retention (SIR), that is, a deductible. The amount of the deductible varied, but was never less than $100,000 per occurrence. Nicor therefore could not obtain indemnification from the London Insurers unless and until its loss for a covered occurrence was more than $100,000. Once the SIR amount had been satisfied, the London Insurers were obligated to indemnify only for the amount in excess of the SIR up to a contractually specified limit of liability. The liability limitations ranged from $750,000 to more than $4 million depending on the policy.

Of the 1,070 homes where mercury contamination was discovered and remediation was carried out, 195 were subject to the policies issued to Nicor by the London Insurers between 1961 and 1978. For the purposes of this litigation, there is no dispute that the investigation and remediation costs attributable to each of those 195 homes, individually, was less than the applicable SIR amount. How the term "occurrence" was construed under the governing policies therefore had major consequences for calculating the extent of the London Insurers' duty to provide indemnification. If each of the 195 spills constituted a separate occurrence within the meaning of the policies, the London Insurers would owe nothing. If, on the other hand, the spills were conceived as constituting but a single occurrence, the amount the London Insurers would be required to pay Nicor would be substantial.

In order to resolve the occurrence issue, Nicor and the London Insurers filed cross-motions for summary judgment pursuant to section 2–1005 of the Code of Civil Procedure (735 ILCS 5/2–1005 (West 2004)). Nicor, for its part, asserted that its liability for the mercury contamination at the 195 homes arose from one occurrence, obligating it to pay a single SIR per policy year to cover all of the contamination claims. The London Insurers, by contrast, contended that Nicor's liability arose from 195 separate occurrences and that Nicor's claims were therefore subject to 195 separate SIRs.

The circuit court denied the London Insurers' motion, but granted summary judgment in favor of Nicor. In the circuit court's view, the contamination was attributable to Nicor's consistent and routine "failure to invoke proper procedures to safely remove the

mercury regulators." The court held that this "systematic failure to consistently remove the mercury regulators resulted in a single 'occurrence' under the [London Insurers'] policies."

Following the circuit court's ruling, Nicor and the London Insurers stipulated to the remaining issues in the case, including: (1) that mercury spills took place in every policy period between 1961 and 1978, (2) that the SIRs under the policies in effect during those years totaled $950,000, and (3) that the London Insurers' *pro rata* liability for the $90 million in losses ultimately incurred by Nicor after satisfaction of the $950,000 in SIRs totaled $10,281,703.46. Based upon these stipulated facts, the circuit court entered final judgment in favor of Nicor and against the London Insurers in the amount of $10,281,703.46.

As noted at the outset of this opinion, the appellate court reversed and remanded for further proceedings. 362 Ill. App. 3d 745. The sole ground for its decision was that the circuit court had misapplied the definition of occurrence contained in the applicable insurance policies. In the appellate court's view, the damages were not caused by Nicor's systemwide failure to remove the regulators safely. Rather, they were the product of separate and independent acts, occurring "in an isolated number of cases as a result of [individual servicemen's] actions or the particular circumstances in each residence." 362 Ill. App. 3d at 754.

Nicor petitioned our court for leave to appeal. 177 Ill. 2d R. 315. We granted its petition. We subsequently allowed BorgWarner, Inc., to file an *amicus curiae* brief in support of Nicor. See 155 Ill. 2d R. 345. We also allowed John Crane, Inc., to file an *amicus curiae* brief in favor of the London Insurers.


ANALYSIS

The sole issue raised by Nicor in this appeal is whether the circuit correctly held that the mercury contamination in the 195 homes for which it submitted claims under the policies it purchased from the London Insurers between 1961 and 1978 constituted a single occurrence within the meaning of those policies. The construction of the provisions of an insurance policy is a question of law, subject to

*de novo* review. *Illinois Farmers Insurance Co. v. Marchwiany*, No. 101598, slip op. at 3 (September 21, 2006).

Insurance policies are subject to the same rules of construction applicable to other types of contracts. See *Continental Casualty Co. v. McDowell & Colantoni, Ltd.*, 282 Ill. App. 3d 236, 241 (1996). A court's primary objective is to ascertain and give effect to the intention of the parties as expressed in the agreement. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993). In performing that task, the court must construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292 (2001), quoting *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997).

The words of a policy should be accorded their plain and ordinary meaning. *State Farm Mutual Automobile Insurance Co. v. Villicana*, 181 Ill. 2d 436, 441 (1998). Where the provisions of a policy are clear and unambiguous, they will be applied as written (*United States Fire Insurance Co. v. Schnackenberg*, 88 Ill. 2d 1, 4 (1981)) unless doing so would violate public policy (*State Farm Mutual Automobile Insurance Co. v. Villicana*, 181 Ill. 2d at 442). That a term is not defined by the policy does not render it ambiguous, nor is a policy term considered ambiguous merely because the parties can suggest creative possibilities for its meaning. Rather, ambiguity exists only if the term is susceptible to more than one reasonable interpretation. *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 530 (1995).

Because insurance contracts are issued under given circumstances, they are not to be interpreted in a factual vacuum. A policy term that appears unambiguous at first blush might not be such when viewed in the context of the particular factual setting in which the policy was issued. *Glidden v. Farmers Automobile Insurance Ass'n*, 57 Ill. 2d 330, 336 (1974). Governing legal authority must, of course, be taken into account as well, for a policy term may be considered unambiguous where it has acquired an established legal meaning. *United States Fire Insurance Co. v. Schnackenberg*, 88 Ill. 2d at 5. Where ambiguity does exist, the policy will be construed strictly against the insurer, who drafted the policy (*Travelers*

*Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d at 293), and liberally in favor coverage for the insured (see *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005)).

As we have just discussed, the case before us today concerns construction of the provisions in Nicor's insurance policies dealing with occurrences. The question is not, however, whether a covered occurrence took place. The London Insurers do not dispute that events transpired which would qualify as an occurrence within the meaning of both versions of the liability policies issued to Nicor by the London Insurers between 1961 and 1978. The issue presented by this litigation is more complex. The problem with which the lower courts wrestled and which we must now resolve is *how many* occurrences there were, 1 or 195.

The definitions of occurrence used in the insurance policies issued by the London Insurers are typical of commercial liability policies. As in our case, such policies often describe an occurrence using terms such as "accident," "happening" or "event." While the form of such terms is singular, what seems like a single accident, happening, or event to the person who triggered the incident giving rise to the loss for which coverage is sought may be perceived as multiple accidents, happenings or events from the perspective of those who sustained injury or damage as a result of the insured's conduct. Accordingly, the terms of the insurance policy are not always sufficient, standing alone, to permit a definitive determination as to whether a particular case involves one occurrence or many.

In order to overcome this problem, American courts have developed two basic approaches for assessing the number of occurrences that took place within the meaning of policies such as those at issue in this case, the cause theory and the effect theory. The effect theory, as its name implies, determines the number of accidents or occurrences by looking at the effect an event had, *i.e.*, how many individual claims or injuries resulted from it. Under the cause theory, on the other hand, the number of occurrences is determined by referring to the cause or causes of the damages. See *Illinois National Insurance Co. v. Szczepkowicz*, 185 Ill. App. 3d 1091, 1094-95 (1989).

The difference between these two approaches is illustrated by the following hypothetical. Assume that a motorist is traveling down a

street lined with parked cars. Looking away from the roadway to change the station on his car's radio, the motorist allows his vehicle to wander. As a result, his car strikes the sides of three of the parked cars in succession, damaging each of them. The owners of the three damaged vehicles sue, and the vehicle owner seeks indemnification from his automobile insurance carrier. Under the effect theory, the fact that three cars were damaged and three claims were filed would mean that there were three "occurrences" for purposes of determining liability coverage, absent specific policy language to the contrary. Under the cause theory, on the other hand, the fact that the damage to all three vehicles resulted from the same conditions and was inflicted as part of an unbroken and uninterrupted continuum would yield the conclusion that there was only one occurrence. See *Illinois National Insurance Co. v. Szczepkowicz*, 185 Ill. App. 3d at 1095-96 (discussing application of cause theory to traffic accidents).

Neither the cause theory nor the effect theory inevitably favors one party to an insurance contract over another. Whether a particular approach would be more beneficial to the insurance carrier or its insured depends on the limits of coverage, the number of claims, the magnitude of the claimant's losses, and the size of applicable deductibles in a given case. For example, attributing damages sustained by multiple claimants to multiple occurrences would be beneficial to the insured where the claims are large relative to the per-occurrence policy limits, for it would maximize the coverage the insured will receive. It would benefit the insurance carrier where, as in this case, the individual claims are each smaller than the applicable deductible, for it would allow the insurer to avoid paying anything. The full loss would be borne by the insured.

A majority of jurisdictions have adopted the cause theory to determine the number of occurrences under general liability insurance policies of the type at issue in this case. Although this court has not addressed the issue, our appellate court has consistently concluded that the cause theory represents the approach which the courts of Illinois should follow. See *Aetna Casualty & Surety Co. v. O'Rourke Bros., Inc.*, 333 Ill. App. 3d 871, 881-82 (2002); *Illinois Central R.R. Co. v. Accident & Casualty Co. of Winterthur*, 317 Ill. App. 3d 737, 745-46 (2000); *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 648 (1994); *Illinois National Insurance Co. v.*

*Szczepkowicz*, 185 Ill. App. 3d at 1094-95; *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d 454, 459-60 (1988). In accordance with this line of authority, the appellate court's decision in the case before us adhered to the cause theory in construing and applying the subject policies. Neither Nicor nor the London Insurers question that aspect of the appellate court's decision, and we agree that the cause theory represents the law of Illinois.

To properly understand the cause theory as interpreted and applied in Illinois, one must consider the principal appellate court cases in which the doctrine has been employed. The first opinion to adopt the cause theory was *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d 454 (1988). *Mason* was a declaratory judgment action to determine the amount of liability coverage available to the owner of a restaurant with respect to claims brought by restaurant diners who were stricken with botulism poisoning after consuming patty melt sandwiches containing tainted onions. The tainted food was served to numerous customers over a three-day period. Applying the cause theory, the appellate court held that the restaurant did not become liable until it actually served a portion of the tainted food and that each time a customer was served constituted a separate and distinct occurrence within the meaning of the policy. *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d at 461. In reaching this conclusion, the court distinguished situations where there was an uninterrupted and continuing cause from which all of the injuries resulted, such as where guests' property is damaged in a hotel fire or when an open faucet on an upper floor of a building causes water damage to property on lower floors. *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d at 461.

*Mason* derived its analysis from a federal court opinion, *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374 (6th Cir. 1984), a declaratory judgment action to determine how much insurance coverage was available to pay farmers who had sustained property damage when their livestock consumed tainted feed. The contamination occurred when Michigan Chemical Corporation (MCC). accidently filled an order for a livestock feed supplement with flame retardant, the feed vendor failed to realize the mistake, and the flame retardant was mixed with regular feed and sold to farmers. As a result of the mistake, tens of thousands of farm

animals had to be destroyed, and hundreds of claims were subsequently filed against MCC and the feed vendor.

MCC and a reinsurance company involved in the case argued that each of the claims constituted a separate occurrence within the meaning of the applicable insurance policies. The federal court rejected that argument. Following the view it believed the courts of Illinois would adopt if presented with the question, it held that the number of occurrences was determined not on the basis of the number of injuries, but on the cause or causes of the injuries. In its opinion, the cause of the injury from which MCC's liability arose was the misshipment of the flame retardant and that each separate misshipment, if more than one took place, would constitute a separate occurrence. *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d at 383.

The foregoing decisions were followed by *Illinois National Insurance Co. v. Szczepkowicz*, 185 Ill. App. 3d 1091 (1989). In that case, an insurance company brought a declaratory judgment action to ascertain the amount it was obligated to pay under a liability insurance policy for two lawsuits filed against its insureds. Those lawsuits arose from collisions involving a tractor-trailer unit driven by the defendant and two automobiles. At the time of the collisions, the left rear side clearance light of the tractor-trailer unit was inoperable and there was fog in the area.

The first collision took place when the defendant blocked traffic while preparing to turn and a motorist struck the rear wheels of his rig. After this initial accident, the defendant moved the rig forward and stopped again. In so doing, he failed to completely remove the tractor-trailer unit from all lanes of traffic. Approximately five minutes later, another automobile smashed into the rig, just forward of the point of impact in the first crash. The question in the case was whether these events constituted one accident or occurrence or two within the meaning of the defendant's liability insurance policy, under which coverage was limited to $300,000 per accident.[1]

---

[1]For purposes of construing the relevant insurance policy provisions, the appellate court considered "accident" to be synonymous with "occurrence." *Illinois National Insurance Co. v. Szczepkowicz*, 185 Ill. App. 3d at 1094.

Looking to the language of the policy and the facts of the case, the appellate court concluded that under the cause theory, the two collisions could not be said to have resulted from the same negligent act. Distinguishing situations where one car ricochets off another and then strikes a third vehicle, the court held that there was no single force and no unbroken or uninterrupted continuum that, once set in motion, caused multiple injuries. The court further noted that the conditions resulting in each collision had changed. After the first accident, the defendant should have realized the risk posed in allowing his rig to obstruct traffic lanes while it was foggy. He had the opportunity to take corrective measures by moving the rig off the road, but failed to do so. Instead, by remaining on the roadway and moving forward, which opened a path for traffic that had been blocked at the time of the first collision, he created a new and different hazard to navigation for cars following from behind. The court therefore concluded that there was a separate and second cause for the subsequent collision and that there were two accidents or occurrences under the relevant insurance policy. *Illinois National Insurance Co. v. Szczepkowicz*, 185 Ill. App. 3d at 1096.

Two years afer *Illinois National Insurance Co. v. Szczepkowicz*, 185 Ill. App. 3d 1091 (1989), the appellate court decided *Village of Camp Point v. Continental Casualty Co.*, 219 Ill. App. 3d 86 (1991). *Camp Point* was a declaratory judgment action brought by a village against its attorney and his insurance company to determine how much coverage was available for the attorney's alleged malpractice under a series of professional liability policies which the insurance company had issued. The basis for the underlying malpractice claim was that the attorney had advised the village that it could pledge revenue-sharing and sales tax funds in connection with multiple bond transactions when he knew that such pledges were not approved by statute. The trial court construed the case as involving one unified transaction, namely, the attorney's misinterpretation of the governing law when advising the village pursuant to a contract of employment which was to be performed over an extended period of time, and that there was therefore only one occurrence within the meaning of the attorney's professional liability policies. *Village of Camp Point v. Continental Casualty Co.*, 219 Ill. App. 3d at 97. The appellate court, however, rejected that interpretation. It held that each individual instance in

which the attorney rendered erroneous legal advice was a separate cause of the village's injuries and that there were therefore multiple occurrences for insurance coverage purposes. *Village of Camp Point v. Continental Casualty Co.*, 219 Ill. App. 3d at 103.

The same approach was taken in *Roman Catholic Diocese of Joliet, Inc. v. Lee*, 292 Ill. App. 3d 447 (1997), a declaratory judgment action to determine, *inter alia*, whether multiple acts of sexual molestation committed by a priest against a female minor constituted a single occurrence within the meaning of the insurance policies held by the Diocese in which the priest served. The appellate court held that it did not. Relying on *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d 454 (1988), and decisions from other jurisdictions, and based on the facts of the case and the language of the applicable policies, the court held that it was the repeated exposure of the minor to the negligently supervised priest that provided the basis for indemnification and that, "[a]ccordingly, the minor's exposure to the negligently supervised priest in each of the policy periods constituted a separate occurrence." *Roman Catholic Diocese of Joliet, Inc. v. Lee*, 292 Ill. App. 3d at 455.

To the same effect is *Illinois Central R.R. Co. v. Accident & Casualty Co. of Winterthur*, 317 Ill. App. 3d 737 (2000), an action between a railroad and its insurance carriers to determine the extent of the carriers' obligation to indemnify the railroad for over $13 million in defense and settlement costs it incurred as the result of discriminatory hiring decisions made by one of its employees. In that case, the railroad argued that only a single occurrence was involved, namely, its decision to delegate hiring decisions to the employee who made the decisions which subjected it to liability. The appellate court rejected that contention. Under its view of the cause theory, the discriminatory hiring decisions did not comprise the continuation of a single process or condition, but rather were the product of multiple individual acts which took place over an extended period of time. The court therefore concluded that each of the discriminatory hiring decisions was a separate occurrence within the meaning of the governing policy provisions. *Illinois Central R.R. Co. v. Accident & Casualty Co. of Winterthur*, 317 Ill. App. 3d at 746-50.

In all of the foregoing cases, the insurance policies' definition of occurrence was similar to the definitions contained in the policies

-13-

involved in this case. The policy in *Mason* defined an occurrence as either an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury. It further stated that all damages arising out of such exposure to substantially the same conditions shall be considered as arising out of one occurrence. *Mason*, 177 Ill. App. 3d at 459.

In *Michigan Chemical Corp. v. American Home Assurance Co.*, one set of policies defined occurrence as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period" and stated that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d at 378. Another set of policies similarly provided that with respect to property damage, an occurrence was "1) an accident or 2) continuous or repeated exposure to conditions which results in injury to or destruction of tangible property, including consequential loss resulting therefrom, while this agreement is in effect" and that "[a]ll damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence." (Emphases omitted.) *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d at 378.

The policies in *Roman Catholic Diocese of Joliet*, 292 Ill. App. 3d at 449-50 likewise stated that an occurrence was "an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results [*sic*] in personal injury, or damage to property during the policy period." The policies also provided that all exposure to substantially the same general conditions existing at or emanating from one location was to be deemed one occurrence.

Under the policy considered in *Illinois Central R.R. Co.*, 317 Ill. App. 3d at 745, the term occurrence meant "one or more accidents or disasters and/or series of accidents or disasters arising out of or resulting from one event." In *Illinois National Insurance Co. v. Szczepkowicz*, 185 Ill. App. 3d at 1094, "one accident" (which was viewed as synonymous with occurrence) was defined as "all bodily injury and property damage resulting from continuous or repeated

-14-

exposure to substantially the same conditions." *Camp Point*'s policy stated simply that with regard to professional services, an occurrence was "an error, negligent omission or negligent act or a series of related errors, negligent omissions or negligent acts, regardless of the number of claims or claimants." *Village of Camp Point*, 219 Ill. App. 3d at 88. In none of these six cases was the term occurrence found to be ambiguous.

As our discussion has indicated, all of the foregoing cases ultimately concluded that covered damages resulted from multiple occurrences. There have been a few decisions, however, in which the damages were found to be the product of a single occurrence. The first Illinois appellate court case to have so found is *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598 (1994), a declaratory judgment action brought by United States Gypsum Company (Gypsum) against its insurers to obtain coverage for actions filed against it based on its manufacture and sale of building material containing asbestos. The building material consisted primarily of ceiling finishing plaster which was installed at various locations at various times between 1937 and the 1970s. *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d at 607-08.

Among the issues raised in the case was whether the actions giving rise to Gypsum's liability constituted multiple occurrences for purposes of calculating the deductible limits under certain of Gypsum's liability policies. Those policies contained language similar to that used in the cases we have already discussed. One set of policies provided that "[t]he deductible amount shall apply 'per occurrence' to the Bodily Injury and Property Damage combined regardless of the number of persons or organizations seeking damages" and that "[a]ll damages arising out of a common defect, condition or cause shall be considered as arising out of one occurrence." *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d at 648. A second set of policies stated that " 'occurrence' shall mean sudden or continuous or repeated exposure to any condition resulting in *** injury or destruction during the policy period" and that "all such injury or destruction caused by continuous or repeated exposure to substantially the same condition shall be deemed to result from one occurrence." *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d at 647.

-15-

Looking first to this policy language, taking into account the cause theory for determining the number of occurrences under a liability policy, and considering the factual circumstances giving rise to Gypsum's liability, the appellate court concluded that the operative cause was "the continuing process of the manufacture and sale of asbestos-containing products." *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d at 649. Central to the court's analysis was the nature of the product involved. "Generally," the court observed, it has been held that " 'if the continuous production and sale of an intrinsically harmful product results in similar kinds of injury or property damage, then all such injury or property damage results from a common occurrence.' [Citations.]" *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d at 650. The court further took into account the nature of Gypsum's involvement in the process that gave rise to the damages for which indemnification was sought. Citing *Mason v. Home Insurance*, 177 Ill. App. 3d at 459-60, for the proposition that the type of activity in which the insured engages should be considered in determining the number of occurrences, the court rejected the argument that each installation of asbestos-containing building material should be viewed as a separate occurrence. In the court's view:

> "[i]t would be unwise and without support in case law to determine that each installation of the asbestos-containing products constituted a separate occurrence when Gypsum's liability is predicated on its involvement in the manufacture and sale of the products rather than the installation of the products." *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d at 651.

The analysis employed in *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, is consistent with that followed by the United States District Court for the Northern District of Illinois in *Household Manufacturing, Inc. v. Liberty Mutual Insurance Co.*, 1987 U.S. Dist. LEXIS 1008 (N.D. Ill. February 11, 1987), *mod. on other grounds*, 1987 U.S. Dist. LEXIS 10837 (N.D. Ill. November 16, 1987). *Household Manufacturing, Inc.* involved a dispute over an insurance company's alleged failure to indemnify a company for damages arising from the company's manufacture and sale of a plastic hot-cold pressure plumbing system (the Quest system) for residential

use. The Quest system was manufactured and then supplied to plumbing contractors throughout the United States on a continuous basis over multiple years. Numerous lawsuits ensued, claiming that the system was defective and had caused property damage. Those lawsuits were brought primarily on theories of strict liability, tort, breach of warranty and negligence. *Household Manufacturing*, 1987 U.S. Dist. LEXIS 1008, *1.

The principal issue in the case was whether the claims for which coverage was sought constituted one occurrence or multiple occurrences within the meaning of the applicable liability policies. The company which manufactured and sold the system argued that there was only a single occurrence, that it was therefore subject to only one "stop loss" amount, and that all sums included within ratable incurred losses above that single stop loss amount must be indemnified by its insurer up to the policy limits.

The policies in question defined occurrence as "an accident, including continuous or repeated exposure to conditions, which results in 'bodily injury' or 'property damage' neither expected nor intended from the standpoint of the 'insured.' " *Household Manufacturing*, 1987 U.S. Dist. LEXIS 1008, *5-6. The polices further provided that for purposes of determining liability, "all 'personal injury' and all 'property damage' arising out of continuous or repeated exposure to substantially the same general conditions *** shall be considered as arising out of one occurrence." *Household Manufacturing*, 1987 U.S. Dist. LEXIS 1008, *6.

In applying these provisions to the particular facts of the case in accordance with the cause theory, the court agreed with the manufacturer's position. The court observed that it had to rely on " 'the ordinary meaning of the words [in the policy], in relation to the business risk to be insured against,' " namely, " 'protection from liability from a defective product produced in a continuous flow of production and intended for widespread use *** ending in a multitude of consumer products in many hands.' [Citation.]" *Household Manufacturing*, 1987 U.S. Dist. LEXIS 1008, *12. According to the court, the manufacturer in this case sold its system on a mass basis, "and it was anticipated that any defects in the system would affect a large number of persons in the chain of distribution." *Household Manufacturing*, 1987 U.S. Dist. LEXIS 1008, *12. The continuous

and repeated manufacture and sale of an allegedly defective product on a mass basis is what gave rise to the manufacturer's liability and to its right to recover under the policies and therefore constituted the single, unitary cause of the claims against the manufacturer. Accordingly, the court concluded, there was but one occurrence within the meaning of the insurance policies, and the insurer was obligated to indemnify the manufacturer for all ratable incurred losses over the stop loss amount. Numerous cases from other jurisdictions involving the sale of defective products by an insured manufacturer were cited by the court in support of this holding. See *Household Manufacturing*, 1987 U.S. Dist. LEXIS 1008, *14-20.

A single cause was also found in *Aetna Casualty & Surety Co. v. O'Rourke Bros., Inc.*, 333 Ill. App. 3d 871 (2002), a declaratory judgment action to settle insurance coverage questions arising from claims filed against the insured, a consumer electronics distributor, based on its scheme to defraud costumers in connection with the sale and financing of satellite systems. Under the applicable liability policy, the insurer's obligation to indemnify the distributor for covered damages was subject to a $10,000 retained limit. The retained limit, which operated like a deductible, applied to "any one occurrence or offense." An occurrence, in turn, was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Aetna Casualty & Surety Co. v. O'Rourke Bros., Inc.*, 333 Ill. App. 3d at 881. Applying the analysis set forth in *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, the court held that the cause of the claims for which indemnification was sought was the distributor's fraudulent sales campaign. In the court's view, that campaign was not a series of separate and discrete events, but rather a single, continuing process. The court therefore concluded that there was only one occurrence for purposes of the liability policy. Accordingly, the retained limit amount did not apply to each individual claim. Instead, it was to be applied only once to all of the claims combined. *Aetna Casualty & Surety Co. v. O'Rourke Bros., Inc.*, 333 Ill. App. 3d at 882.[2]

---

[2]Single occurrences were also involved in two additional appellate court cases, *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 283 Ill. App. 3d 630 (1996), which pertained to the ongoing pollution of Waukegan

Applying the foregoing body of case law, the appellate court in the case before us today concluded that where each asserted loss is the result of a separate and intervening human act, whether negligent or intentional, or each act increased the insured's exposure to liability, Illinois law will deem each such loss to have arisen from a separate occurrence within the meaning of liability policies containing language similar to that used in the policies issued to Nicor by the London Insurers. 362 Ill. App. 3d at 753. By contrast, where the damages for which coverage is sought resulted from the manufacture and sale of defective products or a fraudulent sales scheme, the loss will be found to have emanated from a single cause and there will be but one occurrence for purposes of the applicable policies. 362 Ill. App. 3d 752.

The parties to this case have not asserted that the losses incurred by Nicor were the result of the manufacture and sale of defective products or a fraudulent sales scheme. The appellate court therefore concluded that cases such as *Household Manufacturing, Inc. v. Liberty Mutual Insurance Co.*, 1987 U.S. Dist. LEXIS 1008 (N.D. Ill. February 11, 1987); *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598 (1994), and *Aetna Casualty & Surety Co. v. O'Rourke Bros., Inc.*, 333 Ill. App. 3d 871 (2002), were distinguishable. In the appellate court's view, this dispute fell instead under the line of cases beginning with *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d 454 (1988), where each asserted loss was the result of a separate and intervening human act or each act

Harbor caused by the insured's manufacturing plant, and *Missouri Pacific R.R. Co. v. International Insurance Co.*, 288 Ill. App. 3d 69 (1997), involving claims by the insured's employees for on-the-job hearing loss and asbestos exposure. In neither of those cases, however, was the issue of single or multiple occurrences raised in the same context that it is presented here. The principal issue they addressed is how coverage should be allocated among different policies covering different periods of time. See also *Hartford Casualty Insurance Co. v. Medical Protective Co. of Fort Wayne, Indiana*, 266 Ill. App. 3d 781 (1994) (doctor's negligence which took place during multiple policy periods constituted single occurrence and policies covering the separate periods could not be stacked).

increased the insured's exposure to liability. Based on that line of cases, applied in the factual context of this case and in light of the language used in the pertinent policies, the appellate court held that each of the 195 mercury spills subject to the London Insurers' policies constituted a separate occurrence. 362 Ill. App. 3d at 754-56.

We believe that the appellate court's analysis was sound. The circumstances of this case place it squarely within *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d 454 (1988), and its progeny. The liability for which Nicor sought indemnification from the London Insurers did not arise from any inherent defect in the old-styled gas regulators or the manner in which they were installed in customers' homes. Nor did it derive from any systemwide policy or procedure regarding the methodology employed for removing the regulators between 1961 and 1978, the period covered by the London Insurers' policies. To the contrary, the record indicates that the methods employed by Nicor for removing the regulators during the period in question were the same as those ultimately approved by the court after the Attorney General filed suit against the company in the year 2000.

Liability was incurred only when mercury happened to spill as an old-style regulator was being replaced with one of the new mercury-free units. Such spills were extremely rare. Impermissibly high levels of mercury contamination were discovered in one-half of 1% of the homes where physical inspections were undertaken.[3] The spills had no common cause. Mercury escaped from the regulators under a variety of circumstances, including unique physical circumstances in particular homes which required technicians to tilt gas meters in order to remove them. One spill was reported to have resulted when the Nicor technician accidently stumbled or tripped. Sometimes technicians were

---

[3]Nicor contends that the true incidence of mercury contamination is actually unknown because early spills may have evaporated and left no traces by the time testing was undertaken. Aside from being entirely speculative, this observation is irrelevant. The purpose of this litigation is to resolve responsibility for costs incurred in detecting and remediating mercury contamination that was still present in customers' homes. If a spill had evaporated and left no traces, there could be no dispute regarding who should bear the burden of remediation costs, for no remediation was necessary.

careless and neglected to follow Nicor's safe mercury-handling procedures. In addition, the spills occurred at different times over a 17-year period in the case of the spills subject to the London Insurers' policies. No temporal or geographical pattern to these spills was established, and no claim was made that any particular technician or group of technicians was responsible for the spills. The technicians did not even share a common employer. Some were apparently Nicor employees while others worked for the company's subcontractors. To say that each of the 195 spills emanated from a single cause would, under these circumstances, be completely untenable.

As we have previously discussed, the relevant policies in effect between 1961 and 1976 define an occurrence as "one happening," or a series of happenings arising out of or due to "one event," while the policies for 1976 through 1978 speak of "an accident" or "event" or "continuous or repeated exposure to conditions which result in [injury, death or physical damage to or destruction of property]." Nothing in these definitions is materially different from the definitions employed in the various Illinois appellate court decisions to which the appellate court looked for guidance, and they are no more ambiguous in this case than they were in those cases. Giving the words of the policies their plain and ordinary meaning, as we must, the 195 spills were not "one happening," they were not derived from "one event, " and they were not all part of "an accident." Moreover, they cannot be characterized as involving "continuous or repeated exposure to conditions which result in [injury, death or physical damage to or destruction of property]." They were sporadic, not part of an uninterrupted process, and in no instance evident in the record was any customer's home ever subject to more than one exposure to mercury contamination. The exposure therefore could not have been "repeated."

In arguing that the damages attributable to the spills should be characterized as haven arisen from a single cause, Nicor asserts that its "liability was not tied to any individual spills." Rather, it attributes its liability to the overall costs of investigating and remediating the spills in response to the legal actions filed against it, costs which it contends are indivisible. This argument is without merit. The legal action is not the operative "happening," "event," or "accident" giving rise to liability under the policies. The spills are, and the damages

associated with the 195 specific spills covered by the polices can be and have been specifically identified.[4]

There is likewise no merit to Nicor's contention that the spills should be viewed as the result of a single cause because the individual claims of its customers were allowed to proceed as a class action and the attorney general's action sought redress for all of the spills at the same time in the same proceeding. Consolidation of individual claims and the request for comprehensive remedial action in the underlying litigation relate to questions of litigation efficiency. They have no bearing whatever on the issue of how many occurrences there were under the terms of the applicable insurance policies.

We also reject Nicor's argument that an interpretation of the policies to find 195 separate occurrences rather than one single occurrence will somehow deny it the benefit of its bargain. Because the damages attributable to each of the 195 contaminated homes was conceded to be less than the applicable deductibles, the determination that each spill was a separate occurrence and therefore subject to a separate deductible does mean that Nicor will be able to collect nothing from the London Insurers. An insurance contract, however, is not a guarantee of indemnification for every dollar of every loss.

Through deductibles or self insured retentions, a policy holder may elect to absorb part of the risk for any covered loss in exchange for reduced premiums. That is precisely what Nicor did here. There is nothing in the policies themselves or in the circumstances surrounding the purchase of those policies to suggest in any way that the parties specifically contemplated that if situations like this one arose, the losses would be consolidated for purposes of determining the applicable deductible. In light of the policy language as interpreted in Illinois, Nicor knew or should have known that such claims would be viewed as individual occurrences. By electing deductibles in the

---

[4]We further note, parenthetically, that if the remediation order entered in the underlying legal proceedings were deemed to be the cause of Nicor's damages, the London Insurers' policies would not even be involved. The coverage provided by those policies ended in 1978. The legal proceedings against Nicor were not resolved and the remediation order was not entered until the year 2000.

amounts it did, Nicor voluntarily agreed to assume the risk of absorbing individual claims of the magnitude involved here. What it apparently misjudged is the total number of such individual claims it might have to meet at once. While that is unfortunate from Nicor's point of view, the company was not an unsophisticated consumer who was unfairly taken advantage of. It is a major business corporation with substantial experience and formidable bargaining power. No principle of public policy authorizes courts to relieve such entities of the consequences of business calculations merely because those calculations ultimately prove to be erroneous.

BorgWarner, Inc., who appears in this case as a friend of the court, concedes that current Illinois case law supports the appellate court's determination that each of the 195 spills constituted a separate occurrence. It also rejects the contention that making each spill subject to a separate deductible would deny Nicor the benefit of its bargain. In its view, however, the way in which the cause theory has been applied in Illinois has become mired in inconsistency and unpredictability. It argues that this court should address this problem by refocusing on established principles of contractual construction and acknowledge that the term occurrence is ambiguous on its face and under the facts of this case.

We reject BorgWarner, Inc.'s position for three reasons. First, in making its argument, BorgWarner suggests that insurance policy provisions should be found ambiguous whenever there is no clear answer on the face of the policy itself as to how those provisions should be applied in a particular factual setting. This approach is not supported by the law of Illinois, as the discussion of insurance policy ambiguity set forth earlier in this opinion shows. Second, as we have previously noted, Illinois courts have expressly considered whether policy provisions such as those at issue in this case were ambiguous and held that they are not. BorgWarner cites no authority from this state to support a contrary position. Third, wholly aside from these considerations, neither Nicor nor the London Insurers take the position that the term occurrence is ambiguous. This court has held that we will not address issues raised by an *amicus* where, as here, those issues have not previously been raised by the parties themselves. *In re Parentage of M.J.*, 203 Ill. 2d 526, 542 (2003).

As with BorgWarner, John Crane, Inc., the other *amicus* in this case, agrees that the appellate court was correct in concluding that the 195 mercury spills were separate occurrences under the controlling policies. It also believes, however, that the cause theory, as presently applied, has yielded inconsistent results. The remedy it proposes is similar to BorgWarner's in that it would have courts refocus their analysis on the language used in the policies. The difference is that unlike BorgWarner, John Crane sees no inherent ambiguity in the term occurrence. Instead, it contends that in evaluating how many occurrences there are for purposes of coverage under a liability policy, courts should look first to whether the policy contains a "unifying directive," that is, language that purports to aggregate multiple injuries and claims arising at different times and places into a single occurrence. Under John Crane's analysis, the presence of such a unifying directive would not necessarily result in a finding of a single occurrence. In the absence of a unifying directive, however, it would hold that "a single, omnibus occurrence result is never appropriate."

We express no view on the merits of John Crane's proposal for the simple reason that the rule the company suggests is not necessary to the disposition of this case. A "no unitary directive rule" would have no bearing on the policies issued by the London Insurers for the period between November of 1976 and 1978 because those policies did contain a unifying directive. As John Crane argues, as the appellate court found, and as we affirm today, the damages attendant to the mercury spills nevertheless constituted separate occurrences within the meaning of those policies.

While the polices in effect between 1961 and November of 1976 lacked a unifying directive, having a "no unitary directive rule" would not affect our construction of those policies either. The existing analytical framework as developed by the appellate court in *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d 454 (1988), and the cases that followed already make clear that the dispute before us here involved multiple occurrences rather than one omnibus occurrence. Whether we had a "no unitary directive rule" or not, the result in this case would therefore remain unchanged. Accordingly, any discussion of the merits of such a rule would be purely academic.

Finally, both BorgWarner and John Crane argue that the inconsistency they see in the current approach can be remedied by

adopting a different formulation for applying the cause test than has been used by our appellate court. BorgWarner argues for a "cause of injury test." John Crane speaks of a "last causal element" test. Although their nomenclature differs, these approaches are premised on a common idea, namely, that the immediate event giving rise to the injury should be deemed the cause of an occurrence.

As a preliminary matter, we are unconvinced that the existing approach has created the inconsistency *amici* claim. The principal example of inconsistent results cited by John Crane involves *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d 454 (1988), and *United States Gypsum Co. v. Admiral Insurance Co*., 268 Ill. App. 3d 598 (1994), both of which we have discussed in this opinion at length. According to John Crane, the contaminated patty melts in *Mason* were no different than the building material containing asbestos in *United States Gypsum* and the two cases should therefore have reached the same result. Instead, as we have noted, *Mason* was deemed to have involved multiple occurrences, while *United States Gypsum* found a single occurrence.

Assuming, for the sake of argument, that *Mason's* patty melts are analogous to the asbestos in *United States Gypsum*'s building materials, we do not believe that these decisions are at odds. There is a critical distinction between the cases which John Crane overlooks: the predicate for the policy holders' liability. The insured party in *Mason* was the restaurant owner whose liability was based on his sale of the contaminated food to the consumers who patronized his restaurant. In *United States Gypsum*, the insured party manufactured and distributed the building materials, but did not sell them to consumers or install them in the end-users' structures. That was done by others. Accordingly, the insured's liability was based on its manufacture and distribution of the materials, not their sale to consumers and ultimate installation As the appellate court in this case recognized, the analysis in *U.S. Gypsum* suggests that if the insured's liability had been based on installation of the materials rather than their manufacture, each installation would have been a separate occurrence, just as each sale of a patty melt was a separate occurrence in *Mason*. 362 Ill. App. 3d at 742. The cases are therefore not incompatible.

In any event, as the London Insurers aptly observe, adopting the alternate formulations proffered by the *amici* would not alter the result

in this case. Under any approach to the cause theory, the mercury spills would be separate occurrences under the policies they issued to Nicor. Because we perceive no inconsistency in the current approach to the question as developed by our appellate court and because the alternative analytical framework advanced by the *amici* would not alter our disposition of the present case, we respectfully decline the *amici*'s request to use this litigation to recast the law.

## CONCLUSION

For the foregoing reasons, the appellate court acted correctly when it rejected the circuit court's conclusion that the liability incurred by Nicor was the result of a single occurrence, reversed the circuit court's judgment, and remanded for further proceedings. Under the liability policies issued to Nicor by the London Insurers between 1961 and 1978, each of the 195 spills did constitute a separate occurrence, as the appellate court properly held. The appellate court's judgment is therefore affirmed.

*Affirmed.*

JUSTICE BURKE took no part in the consideration or decision of this case.