# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-3052

ROBERT WEHRLE and
HEIKE WEHRLE,

*Plaintiffs-Appellants*,

*v.*

CINCINNATI INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:12-cv-00331—**Gary S. Feinerman**, *Judge*.

ARGUED JANUARY 15, 2013—DECIDED JULY 8, 2013

Before POSNER, WOOD, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. When Heike Wehrle and Robert Wehrle were severely injured in an auto accident with a drunk-driver carrying minimal insurance, they contacted their own insurance company, Cincinnati Insurance Company (Cincinnati), invoking the underinsured-motorist provision of their policy. Cincinnati paid them the difference between their $1 million coverage limit

(their combined injuries exceeded this amount) and the $200,000 that they had received from the at-fault driver's insurer. The Wehrles sued, claiming that they were owed the full $1 million. The district court granted Cincinnati's motion for summary judgment, finding that the language in their insurance policy unambiguously supported the company's interpretation and was consistent with the gap-filling purpose of underinsured-motorist insurance. We affirm.

## I. BACKGROUND

While driving their sport-utility vehicle in Kane County, Illinois, in December 2010, the Wehrles were struck by drunk-driver Eric Barth. Robert Wehrle's injury claim stemming from this accident exceeded $750,000 and Heike's exceeded $1.5 million. Unfortunately for the Wehrles, the drunk-driver's auto insurance policy included a $100,000 per-person liability limit. Robert and Heike each recovered this amount from Barth's insurer.

With the size of their injury claims far exceeding the limits of the drunk-driver's insurance coverage, the Wehrles turned to their own insurer. Their policy with Cincinnati included underinsured-motorist coverage, which enables policyholders to recover up to $1 million from Cincinnati in situations like this one, where the at-fault driver's insurance does not cover the full scope of the injuries sustained.

Despite the facts that the Wehrles' injuries totaled $2,250,000 and that their underinsured-motorist cov-

erage allowed policyholders to recover a maximum of $1 million, Cincinnati paid out $800,000. The company noted that the Wehrles' policy included a provision that reduces its $1 million maximum payout "by all sums paid by anyone who is legally responsible," and that the Wehrles had recovered a total of $200,000 from the drunk-driver's insurer. Accordingly, Cincinnati concluded that it owed the Wehrles only $800,000 under the terms of its policy.

The Wehrles filed suit in federal district court to recover the $200,000 that Cincinnati offset from its $1 million coverage limit. They claimed that the $100,000 that they each received from the drunk-driver's insurer should not be applied to the $1 million cap on their underinsured-motorist coverage, but rather should be applied to their individual claims. In other words, Robert's $100,000 recovery from the drunk-driver's insurer should reduce his injury claim from $750,000 to $650,000, and Heike's $100,000 recovery should reduce her claim from $1.5 million to $1.4 million. The Wehrles contended that the $1 million cap on recoveries should be imposed *after* these reductions are made—*contra* Cincinnati's practice of imposing the $1 million cap and *then* reducing it by payments paid by the at-fault driver's insurer. Cincinnati maintained that its reduction of the $1 million cap by the total amount that the Werhles recovered from the drunk-driver's insurer is proper under the terms of its policy and under Illinois law.

The district court, sitting in diversity, denied the Wehrles' motion for summary judgment, granted Cincin-

nati's motion for summary judgment, and entered final judgment for Cincinnati. The Wehrles appeal these rulings.

## II. ANALYSIS

We review de novo a district court's grant of summary judgment. *Lees v. Carthage Coll.*, 714 F.3d 516, 520 (7th Cir. 2013). In reviewing a grant of summary judgment, we construe all facts in the light most favorable to the non-movant—here, the Wehrles—and draw all reasonable inferences in that party's favor. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491 (7th Cir. 2000).

### A. The Insurance Policy

The parties agree that Illinois law applies to our interpretation of the underinsured-motorist provisions of the Wehrles' insurance policy with Cincinnati. Under Illinois law, "[a]n insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies." *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). Illinois courts interpret the policy "as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). Specifically, to determine whether an ambiguity exists, "[a]ll the provisions of the insurance contract, rather than an isolated

part, should be read together." *U.S. Fire Ins. Co. v. Schnackenberg*, 429 N.E.2d 1203, 1205 (Ill. 1981).

In determining whether a provision of an insurance policy is ambiguous, Illinois courts examine whether it "is subject to more than one reasonable interpretation, . . . not whether creative possibilities can be suggested." *Bruder v. Country Mut. Ins. Co.*, 620 N.E.2d 355, 362 (Ill. 1993) (internal citation omitted). "Reasonableness is the key." *Id.* Thus, "[c]ourts will not strain to find ambiguity in an insurance policy where none exists." *McKinney v. Allstate Ins. Co.*, 722 N.E.2d 1125, 1127 (Ill. 1999).

Where an ambiguity does exist, we construe the policy strictly against the insurer. *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 286 (Ill. 2006). But "if the provisions of the insurance policy are clear and unambiguous there is no need for construction and the provisions will be applied as written." *Schnackenberg*, 429 N.E.2d at 1205. Where the provisions "are clear and unambiguous, they must be given their plain, ordinary, and popular meaning, and the policy will be applied as written, unless in contravenes public policy." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007) (internal citation omitted).

The Wehrles call our attention to several provisions of their underinsured-motorist coverage with Cincinnati. We have excerpted the relevant policy provisions in an appendix following this opinion. In brief, the key provisions for purposes of this appeal are:

A.  Coverage

    1.  We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or operator of an "underinsured motor vehicle" . . .

. . .

D.  Limit of Insurance

    1.  Regardless of the number of covered "autos," "insureds," premiums paid, claims made or vehicles involved in the "accident," the most we will pay for all damages resulting from any one "accident" is the Limit of Insurance for Underinsured Motorists Coverage shown in the Schedule or the Declarations.

    2.  Except in the event of a "settlement agreement," the Limit of Insurance for this coverage shall be reduced by all sums paid or payable:

        a.  By or for anyone who is legally responsible, including all sums paid under this Coverage Part's Liability Coverage.

    . . .

Cincinnati calculated its payment to the Wehrles via the following analysis. First, the company noted that the Wehrles' policy includes a $1 million Limit of Insurance for any one accident. Thus, § D.1 serves to cap the Wehrles' recovery at $1 million. (The Wehrles agree that § D.1 entitles them to no more than $1 million.) Next, Cincinnati invoked § D.2 of the policy, which

states that the Limit of Insurance is to be reduced by all sums paid by anyone who is legally responsible for the accident. Cincinnati noted that the drunk-driver's insurer paid the Wehrles a total of $200,000 for the accident. Cincinnati therefore reduced its payment by this amount, leaving the Wehrles with $800,000.

The Wehrles present a different interpretation of the above provisions from their underinsured-motorist policy. They suggest that it is unclear whether the $1 million Limit of Insurance in § D.1 applies as a first step, after which coverage is reduced by all sums paid (which is Cincinnati's view), or whether coverage is reduced by all sums paid and *then* the $1 million Limit of Insurance is applied. Under this second reading, the court should first apply § D.2, reducing the Wehrles' payment by all sums paid by the legally responsible party, and then apply the $1 million ceiling as per § D.1. If one were to adopt this second approach, then one would first decrease Heike Wehrle's claim from $1.5 million to $1.4 million, based on the $100,000 payment from the drunk-driver's insurer to her, and decrease Robert Wehrle's claim from $750,000 to $650,000, based on the $100,000 payment from the drunk-driver's insurer to him. Next, one would apply § D.1's cap on payments. Thus, the Wehrles would receive $1 million under this alternative interpretation of the policy, versus $800,000 under Cincinnati's interpretation of it.

The Wehrles claim that the policy is ambiguous regarding which of these two interpretations is operative. Since Illinois courts construe ambiguous policies strictly

against the insurer, *Nicor*, 860 N.E.2d at 286, they argue that their interpretation should carry the day.

We disagree. The Wehrles' suggested alternative interpretation flies in the face of the plain language of § D.2: "[t]he Limit of Insurance for this coverage shall be reduced by all sums paid . . . by or for anyone who is legally responsible." We think this provision is straightforward. Since the parties agree that the Limit of Insurance is $1 million and that the drunk-driver's insurer paid the Wehrles' $200,000, it seems plain to us that § D.2 serves to reduce the $1 million Limit of Insurance by $200,000, leaving Cincinnati on the hook for $800,000.

The Wehrles' response to this view is a bit complicated. They contend that their policy contains two forms of insurance: per-insured and per-accident. According to the Wehrles, the per-insured coverage is defined in § A, which has as its object the insured party or parties ("We will pay reasonable expenses incurred . . . for an '*insured*.'" (emphasis added)), and the per-accident coverage is defined in § D.1 ("*Regardless of the number of covered . . . insureds*, the most we will pay for all damages resulting from *any one accident* is the Limit of Insurance." (emphases added)). Based on their understanding of § A as establishing a per-insured track and § D.1 as establishing a per-accident track, the Wehrles claim that § D.2 applies only to the per-insured track in § A—and not to the per-accident track in § D.1. Under the Wehrles' view, only the per-insured section of the policy is subject to reduction based on payments on behalf of the at-fault driver; the per-accident maximum payout cap is a fixed number, not

subject to reduction. They therefore claim that the district court "mixed apples and oranges" by reducing the per-accident cap in § D.1 by $200,000, based on their receipt of that amount from the at-fault driver's insurer.

To support this claim, the Wehrles first point to the fact that § D.2's subject is "The Limit of Insurance *for this coverage*" (emphasis added). Next, they contend that "coverage" is defined in § A (which, as previously explained, supposedly concerns only the per-insured track, distinct from the per-accident track in § D.2). From these two contentions, they conclude that the use of the word "coverage" in § D.2 indicates that § D.2 applies only to § A. In other words, the use of the word "coverage" in § D.2 is a tip-off that § D.2 is meant only to apply to the per-insured track of coverage in § A, and not to the per-accident track in § D.1. Under this interpretation, § D.2's mandate that payouts from Cincinnati be reduced by the amount of any payment to the policyholder by a legally responsible party would not impact Cincinnati's $1 million maximum per-accident payout, which is referenced in § D.1. Instead, under this interpretation, § D.2 would interact exclusively with § A, reducing Robert Wehrle's injury claim from $750,000 to $650,000 and Heike's claim from $1.5 million to $1.4 million. Only then would § D.1 be applied, to cap Cincinnati's total payout to the Wehrles at $1 million.

This interpretation of the policy language appears to create ambiguity and sow confusion where there is none. As an initial matter, there are two necessary factual premises of the Wehrles' alternative interpretation that are entirely baseless.

First, the Wehrles' argument is premised on a claim that the word "coverage" is defined in § A on a per-insured basis. But this section contains no such definition. Second, the Wehrles' argument hinges on the supposed existence of separate per-insured and per-accident tracks of coverage. But this separation of per-insured and per-accident coverage is entirely of their own invention. They convert the language in § A regarding individual-level damages and the language in § D.1 regarding a per-accident cap on coverage into distinct per-insured and per-accident tracks, and then argue that the policy is unclear as to whether § D.2 applies to the per-insured or per-accident tracks. The premise that the policy contains these two separate tracks, however, has no basis in the text of the policy. According to the Wehrles, "[t]he foundational premise of Cincinnati's argument is its insistence that its Policy does not provide separate 'per insured' [underinsured-motorist] coverage." They concede that Cincinnati's position would be correct if the company "can avoid the dichotomy of 'per insured' versus 'per accident' coverage." But Cincinnati can easily avoid this dichotomy, because the Wehrles appear to have created it out of whole cloth.

Both of these contentions must be at least plausible before one even addresses the Wehrles' much more complex argument concerning the interaction of § A and § D.2, and the isolation of § D.1 on a separate track. Unfortunately for the Wehrles, their underinsured-motorist coverage cannot fairly be read to support either premise.

Since both contentions are groundless, their alternative interpretation is foreclosed.

Furthermore, even if one were to assume for the sake of argument that the use of the word "coverage" in § D.2 indicates that the supposed per-insured track in § A—separate from the supposed per-accident track in § D.1—is in effect, the Wehrles' favored interpretation still would be nonsensical. Their interpretation ignores the fact that the $1 million Limit of Insurance is the express subject of § D.2. Recall that § D.2 states that "the Limit of Insurance for this coverage shall be reduced by all sums paid or payable [b]y or for anyone who is legally responsible." Given that the very subject of § D.2 is § D.1's Limit of Insurance, an argument that § D.2 does not act on § D.1 stretches our willingness to consider ambiguity in contractual language past the breaking point.

We also are unconvinced by the Wehrles' claim that interpreting § D.2 as reducing the Limit of Insurance for any one accident by all payments made by a legally responsible party leads to an unjust or absurd result. At first glance, the argument that this interpretation would lead to such a result does have some appeal. Consider the following hypothetical situation. If an underinsured motorist causes a multi-vehicle accident, and Cincinnati policyholders in some vehicles receive workers' compensation payments totaling $1 million, Cincinnati policyholders in other vehicles involved in the accident could receive nothing. Despite having underinsured-motorist coverage, this second group of

policyholders would receive no compensation from any source, due to the fact that other policyholders—with no connection to them—benefited from a third party's payments.

Although such a situation would be troubling, we need not address how Illinois courts would interpret Cincinnati's underinsured-motorist coverage in this hypothetical circumstance. For purposes of the Wehrles' appeal, it suffices to say that this situation is markedly different from theirs. The purpose of underinsured-motorist coverage is to "'fill the gap between the claim and the tortfeasor's insurance' and to prevent the insured from recovering amounts from the insurer over and above the coverage provided by the underinsured-motorist policy." *Cummins v. Country Mut. Ins. Co.*, 687 N.E.2d 1021, 1026 (Ill. 1997) (quoting *Sulser v. Country Mut. Ins. Co.*, 591 N.E.2d 427, 430 (Ill. 1992)). Since that purpose has been effectuated here, there is no injustice or absurdity in the district court's holding.

### B.  Illinois Law

The district court's holding also is consistent with Illinois statutory and case law. The Illinois underinsured motor vehicle insurance statute states: "The limits of liability for an insurer providing underinsured motorist coverage shall be the limits of such coverage, less those amounts actually recovered under the applicable bodily injury insurance policies . . . maintained on the underinsured motor vehicle." 215 Ill. Comp. Stat. 5/143a-2(4) (2004). Cincinnati's reduction of its $1 million Limit

of Insurance by $200,000, based on the Wehrles' recovery of that amount from the at-fault driver, constitutes a straightforward applicable of this statutory language to the situation at hand.

Moreover, this outcome is consistent with the legislature's purpose in enacting this statute, as interpreted by the Illinois Supreme Court. According to the court, "the legislature intended to place the insured in the same position he would have occupied if injured by a motorist who carried liability insurance in the same amount as the policyholder." *Sulser*, 591 N.E.2d at 430. Here, if the at-fault driver had the exact same Cincinnati policy as did the Wehrles, the Wehrles would have received a total of $1 million. Since the Wehrles actually received $200,000 from the at-fault driver and $800,000 from Cincinnati, they are in fact in the same position as they would have occupied in these circumstances. Their claim that they are owed an additional $200,000 from Cincinnati would controvert the statute's purpose. *See id.* ("A provision designed to offer insurance to 'fill the gap' between the claim and the tortfeasor's insurance was obviously not intended to allow the insured to recover amounts from the insurer over and above the coverage provided by the underinsured motorist policy.").

The Wehrles call our attention to *Cummins*, 687 N.E.2d 1021. According to the Wehrles, *Cummins* "dictates that 'per person' [underinsured-motorist] coverage may be reduced only by amounts actually received by the insured." *Cummins*, however, does not dictate this result.

Instead, the most that one could say of *Cummins* is that, in interpreting a different insurance policy and addressing a different legal issue than that in the instant case, the court's holding led to a result in which the insurer was blocked from reducing per-insured coverage based on payments received by others.

As an initial matter, the legal issue in *Cummins* is not related to that in the Wehrles' case. In *Cummins*, the at-fault driver's insurance included the same limit of insurance as did the injured driver's underinsured-motorist coverage—but the at-fault driver's limit of insurance had been reduced to zero based on payments to other injured parties. 687 N.E.2d at 1023. The dispositive issue was whether the injured driver was entitled to *any* underinsured-motorist coverage in these circumstances. *Id.* at 1027. The *Cummins* court held that an at-fault driver is properly deemed to be underinsured in these circumstances, triggering the injured driver's underinsured-motorist coverage. *Id.* at 1023. *Cummins* did not address the circumstances, if any, under which coverage may be reduced based on payments made to third parties—much less "dictate[]" any general rule regarding this subject.

Moreover, unlike the Wehrles' policy with Cincinnati, the insurance policy in *Cummins* expressly stated that per-insured and per-accident coverage limits exist. *Id.* In allowing the insurer in *Cummins* to reduce per-insured coverage only by amounts actually received by the injured party, while permitted it to reduce per-accident coverage by amounts received by other injured individuals,

the *Cummins* court was interpreting a policy that actually contained distinct per-insured and per-accident tracks. Statements in *Cummins* regarding per-insured and per-accident coverage simply do not translate to the instant case, however, since these distinct tracks cannot be found in the Wehrles' policy.

Despite these differences between *Cummins* and the instant case, *Cummins* is still relevant to the matter at hand—just not in the manner that the Wehrles suggest. *Cummins* declares that "providing coverage that fills the gap between the amount actually recovered from the liability insurance and the underinsured-motorist policy limits is consistent with the intent of the underinsured-motorist statute." *Id.* at 1026. In *Cummins*, an injured driver with underinsured-motorist coverage capped at $50,000 sustained over $50,000 damages. The injured driver received $35,000 from the at-fault driver's insurer. *Id.* at 1027. Based on these figures, the Illinois Supreme Court concluded that the injured driver was entitled to state a claim for $15,000 from his insurer. *Id.* This analysis is virtually identical to our analysis here, in which the Wehrles are owed the difference between their coverage limits and the payments that they received from the at-fault driver's insurer.

*Erie Insurance Exchange v. Triana*, 923 N.E.2d 861, 862 (Ill. App. Ct. 2010), provides a useful illustration of how Illinois courts apply this basic principle from *Cummins*— that underinsured-motorist insurance serves to "fill[] the gap" between the amount recovered and the underinsured-motorist coverage's limits, *Cummins*, 687

N.E.2d at 1026—to a set of facts similar to the instant case. Following an accident with an underinsured driver, the plaintiffs in *Triana* submitted a claim to their own insurer, under the underinsured-motorist provision of their policy. 923 N.E.2d at 862. This policy contained strikingly similar language as the Wehrles' policy with Cincinnati. Specifically, the *Triana* policy provided that the insurer "will pay no more than the . . . Underinsured Motorist Coverage limits . . . for any 'auto,' regardless of the number of persons 'we' protect, 'autos we insure,' premiums paid, claims made or 'autos' involved in the accident," and that this "Limits of Protection . . . will be reduced by the amounts paid by or for those liable for bodily injury to anyone we protect." *Id.* at 865. The policy provided a maximum $300,000 in per-accident coverage, less any amounts paid by the tortfeasor's insurer. *Id.* The court in *Triana* noted that the two of the plaintiffs had recovered a total of $200,000 from the tortfeasor's insurer. *Id.* Accordingly, the court found that the plaintiffs were owed $100,000 from their own insurer. *Id.* Given the striking similarities between both the policy language and the factual background here and in *Triana*, the same analysis applies to determine the Wehrles' payment under their policy with Cincinnati.

## III. Conclusion

We find that the text of the Wehrles' insurance policy with Cincinnati clearly and unambiguously supports Cincinnati's interpretation, and that this interpretation is consistent with the gap-filling function of underinsured-

motorist coverage under Illinois law. While we sympathize greatly with the Wehrles' situation, our sympathies cannot blind us to the realities of the insurance contract that the Wehrles entered into with Cincinnati. Accordingly, we AFFIRM.

**APPENDIX: RELEVANT POLICY PROVISIONS**

*Illinois Underinsured Motorists Coverage*

A. Coverage

    1. We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or operator of an "underinsured motor vehicle." The damages must result from "bodily injury" sustained by the "insured" caused by an "accident." The owner's or operator's liability for these damages must result from the ownership, maintenance or use of the "underinsured motor vehicle."

    2. We will pay only after all liability bonds or policies have been partially or fully exhausted by judgments or payments, unless:

        a. We have been given prompt written notice of a "tentative settlement" and decide to advance payment to the "insured" in an amount equal to that "tentative settlement" within 30 days after receipt of notification; or

        b. We and an "insured" have reached a "settlement agreement."

    1. Any judgment for damages arising out of a "suit" brought without written notice to us is not binding on us.

B. Who is an insured

The following are insureds:

1. You are an "insured." However, if you are not a natural person, you are an "insured" only for purposes of selecting limits of Underinsured Motorists Coverage or executing a rejection of Underinsured Motorists Coverage.

2. "Family members" of natural persons shown as a Named Insured in the Declarations of this Coverage Part.

3. Employees of the Named Insured, but only for injuries arising out of and incurred while in the course and scope of employment for the Named Insured shown in the Declarations of this Coverage Part.

4. Anyone for injuries incurred while "occupying" a covered "auto" or a temporary substitute for a covered "auto." The covered "auto" must be out of service because of tis break down, repair, servicing, "loss" or destruction.

5. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured."

. . .

D. Limit of Insurance

1. Regardless of the number of covered "autos," "insureds," premiums paid, claims made or vehicles involved in the "accident," the most we will pay for all damages resulting from

any one "accident" is the Limit of Insurance for Underinsured Motorists Coverage shown in the Schedule or the Declarations.

2.  Except in the event of a "settlement agreement," the Limit of Insurance for this coverage shall be reduced by all sums paid or payable:

    a.  By or for anyone who is legally responsible, including all sums paid under this Coverage Part's Liability Coverage.

    b.  Under any personal injury protection, workers' compensation, disability benefits or similar law.

    c.  Under any automobile medical payments coverage. However, the Limit of Insurance for this coverage shall not be reduced by any sums paid or payable under Social Security disability benefits.

3.  In the event of a "settlement agreement," the maximum Limit of Insurance for this coverage shall be the amount by which the limit of insurance for this coverage exceeds the limits of bodily injury liability bonds or policies applicable to the owner or operator of the "underinsured motor vehicle."

4.  No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Part and any Liability Coverage Part.

. . .